## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 08-cv-01760-WYD-MEH

THE MARIANIST PROVINCE OF THE UNITED STATES, INC., SOCIETY OF MARY, PROVINCE OF ST. LOUIS and at other times, RONCALLI HIGH SCHOOL,

       Plaintiff,

v.

CENTURY INDEMNITY COMPANY, in its own capacity and in its capacity as successor to CCI INSURANCE COMPANY, as successor to INSURANCE COMPANY OF NORTH AMERICA,

       Defendants.

## BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

COMES NOW the Defendant, Century Indemnity Company (hereinafter, "ACE"), by and through its undersigned counsel, and submits the following brief in support of its motion for summary judgment.

## INTRODUCTION

This is an insurance coverage dispute stemming from 24 lawsuits filed against ACE's insured (a religious order) alleging that the order failed to supervise one of its members who sexually abused the underlying plaintiffs. ACE's policies do not provide coverage for the underlying lawsuits because the failure to supervise a sex abuser, as a matter of law, cannot constitute an "occurrence." Moreover, even if such failure to supervise could (in theory) constitute an "occurrence," the undisputed evidence here shows that the religious order knew, before ACE's policies incepted, that the perpetrator was abusing students. Consequently, the subsequent abuse of the underlying plaintiffs during ACE's policy periods was not an "unanticipated or unusual result," and therefore not an "occurrence." ACE is entitled to summary judgment dismissal of all claims against it.

## MOVANT'S STATEMENT OF MATERIAL FACTS

The undersigned is aware of this Court's *Practice Standards* and has pared the statement of facts down to only those facts necessary to support ACE's motion for summary judgment. However, because this case involves insurance coverage and bad faith claims for 24 separate underlying lawsuits, the relevant undisputed facts are somewhat lengthy. The argument section is within the Court's 15-page limit.

### A.    Underlying Lawsuit

1.    Plaintiff, a religious order affiliated with the Roman Catholic Church, is the successor entity to the Society of Mary, Province of St. Louis, which merged in 2002 with three other provinces to become the Marianists Province of the United States, Inc. (the "Marianists"), a Missouri corporation headquartered in Missouri. [*Affidavit of Christopher S. Clemenson in Support of Summary Judgment* ("Clemenson Affidavit") at Ex. 1, pgs. 13:1-15 and 25:6-10; *Second Amended Complaint for Breach of Contract, Bad Faith, Violation of Colorado Unfair Claims-Deceptive Practices Act, and Colorado Consumer Protection Act with Jury Demand* (Doc. #60) (the "Operative Complaint") at ¶ 1. ]

2.    From 1965 to 1971, the Marianists operated Roncalli High School in Pueblo, Colorado pursuant to an agreement with the Bishop of Pueblo (the "Bishop"). [Clemenson Affidavit at Ex. 1, pgs. 95:1-4 and 130:6-9.]

3.    Between November 2005 and May 2007, the Marianists and the Bishop were sued by former Roncalli High School students in 24 separate lawsuits for the negligent supervision of a former Marianist Brother (William Mueller) who allegedly physically and sexually abused the plaintiffs at times they attended Roncalli High School. [*See generally, Affidavit of Eileen Voegele in Support of Summary Judgment* ("Voegele Affidavit") at Exs. 3.a. – 3.f.]

4.    Although the details varied, the lawsuits generally alleged that Brother Mueller would render students unconscious by drugging them with ether (or a similar chemical) under the

2

guise of conducting a legitimate experiment and then sexually abuse them while they were unconscious. [*See generally*, Voegele Affidavit at Exs. 3.a. – 3.f.]

**B.     ACE's Policies**

5.     ACE's predecessor, Insurance Company of North America ("INA"), insured the Marianists under policy no. AGP 1 99 23 (the "First Policy") and policy no. AGP 2 09 51 (the "Second Policy") (collectively, the "Policies"), which were effective from January 10, 1968 to January 10, 1971, and January 10, 1971 to January 10, 1973, respectively. [Voegele Affidavit at Ex. 1 at INA-0001 and Ex. 2 at INA-0061 & INA-0062.]

6.     INA was a Pennsylvania corporation with its principal place of business in Philadelphia, Pennsylvania. [Voegele Affidavit at ¶ 6.]

7.     The Policies were issued to the Marianists in Missouri.   [Voegele Affidavit at Ex.1 at INA-0001 and Ex. 2 at INA-0062.]

8.     The Insuring Agreements for the Policies state, in pertinent part:

> This Company agrees with the named insured to pay on behalf of the Insured all sums which the Insured shall become legally obligated to pay as damages because of personal injury as defined herein, including death at any time resulting therefrom, sustained by any person … caused by an occurrence, as defined herein.

[Voegele Affidavit at Ex. 1 at INA-0009, INA-0013 & INA-0018 and Ex. 2 at INA-0064, INA-0070 & INA-0079.]

9.     The Policies define "personal injury" to include "bodily injury … or if arising out of the foregoing, mental anguish and mental injury[.]" [Voegele Affidavit at Ex. 1 at INA-0009 and Ex. 2 at INA-0070.]

10.     The Policies define an "occurrence" as:

> "Occurrence" means either an accident happening during the coverage period or a continuous or repeated exposure to conditions which unexpectedly or unintentionally causes injury to or destruction of tangible property during the coverage period.  All injury or damages arising out of

3

substantially the same general conditions shall be considered as arising out of one occurrence.

[Voegele Affidavit at Ex. 1 at INA-0018 and Ex. 2 at INA-0079.]

11.     The Policies have personal injury limits of $100,000 for each person with a $300,000 aggregate for each occurrence per policy year.  [Voegele Affidavit at Ex. 1 at INA-0014 and Ex. 2 at INA-0077.]

12.     Garth Allen, the Marianists' expert, agreed that the applicable limits for this case would be capped at the per occurrence limit per policy year.  [Clemenson Affidavit at Ex. 2, pg. 18:1 – 10.]

**C.      Tender to ACE**

13.     The Marianists tendered the underlying lawsuits to ACE for defense and indemnity.  [Voegele Affidavit at ¶ 7 and Exs. 3.a.-f.]

14.     ACE accepted the Marianists' tenders under reservations of rights and provided a defense for 20 of the 24 lawsuits, but denied a defense and coverage for 4 lawsuits in which the underlying plaintiffs alleged that their incidents of abuse occurred before ACE's Policies incepted.  [Voegele Affidavit at ¶ 8 and Exs. 4.a.-e.]

15.     One issue upon which ACE reserved its rights is whether there was an "occurrence."  [Voegele Affidavit at Ex. 4.a. at CIC-0118-0119, Ex. 4.b. at CIC-0083, Ex. 4.c. at CIC-0063 and Ex.4.d. at CIC-2318.]

16.     ACE was concerned that there may be no "occurrence" under its Policies because the underlying plaintiffs alleged the Marianists were aware, prior to the time of their own abuse, that that Brother Mueller had abused other students.  [*See generally*, Voegele Affidavit at Exs. 3.a.-f. and 4.a.-e.]

**D.      Settlement of Underlying Lawsuits**

17.     ACE, the Marianists, the Bishop, and the Bishop's insurer settled 23 of the 24 lawsuits for a total payment of $4,000,000, with ACE contributing $1,350,000, the Marianists

contributing $1,000,000 and the Bishop and its insurer paying the remainder. [Voegele Affidavit at ¶ 17 and Ex. 11.]

18.     The remaining lawsuit was dismissed on summary judgment. [Voegele Aff. at ¶ 17; Clemenson Affidavit at Ex. 3.]

19.     The Marianists did not allocate the settlement payments between the plaintiffs or to any particular type of abuse. [Clemenson Affidavit at Ex. 1, pgs. 159:13 – 160:7.]

20.     The Marianists assert in this lawsuit that it should not have had to contribute to the underlying settlements and that ACE acted in bad faith by not paying 100% of the settlement. [Operative Complaint at ¶¶ 17-30.]

21.     Garth Allen, the Marianists' expert, acknowledges that where there are legitimate coverage issues, it is not unreasonable for an insurer to have its insured contribute toward the settlement:

Q.     If when analyzing a claim there's evidence suggesting that a policy does not provide coverage for all or part of that claim, is an insurer permitted to engage its insured in discussions about coverage?

A.     Yes. Again, so long as it's done appropriately. If the insurer has counsel, you have to use counsel. And insurance companies need to be, in my opinion, a little bit careful to separate the coverage issues from the claims adjusting issues.

Q.     During those discussions, may an insurer request that the insured contribute to a settlement that will resolve both potentially covered and potentially uncovered claim?

A.     Once again, that's possible. I am critical of how it happened here, of course. It's in my report. But I have seen cases where the insured contributed and I had no problem with it at all.

[Clemenson Affidavit at Ex. 2, pgs. 59:21 – 60:16.]

**E.**    **Marianists' Knowledge of Abuse by William Miller before Roncalli High School**

**The "Situation at Maryhurst"**

22.    In 1960, the Marianists considered assigning the underlying perpetrator, Brother William Mueller, to teach at Don Bosco High School (a Marianist-run school in Wisconsin). [Clemenson Affidavit at Ex. 1, pgs. 50:7 – 51:17; Clemenson Affidavit at Ex. 4, pgs. 28:9-24.]

23.    In response, a Marianist at Don Bosco wrote a letter to the head of the Order (the "Provincial") stating:

> I am writing to remind you of the possible unfavorable situation which could come about were Brother William Mueller sent to Don Bosco. **You will recall the situation at Maryhurst several years ago with him and Robert Olszewski.**

[Clemenson Affidavit at Ex. 4, pgs. 22:20 – 23:22, 28:9-24 & Ex. 1 (the "Situation at Maryhurst Letter").]

24.    ACE received a copy of the Situation at Maryhurst Letter from the Marianists prior to the settlement of the underlying lawsuits. [Voegele Affidavit at ¶ 9 and Ex. 5.a.]

25.    ACE believed the Situation at Maryhurst Letter may have referred to abuse by Brother Mueller about which the Marianists had knowledge before the inception of ACE's Policies. [Voegele Affidavit at ¶ 10.]

26.    The Marianists' Rule 30(b)(6) witness, Brother Stephen Glodek (a former Provincial), admitted that the Situation at Maryhurst Letter could reasonably be read as referring to prior abuse by Brother Mueller:

> Q.    [W]hen you first read the letter as part of the production of Mr. Mueller's personnel file, you determined that you needed to investigate the matters being described in that letter further?
>
> A.    Uh-huh.
>
> Q.    That's correct?
>
> A.    Yes, that's correct.

Q.    And would you agree with me then that a reasonable person reading that letter might believe that it concerned a prior incident of abuse?

A.    Yes.

[Clemenson Affidavit at Ex. 1, pgs. pgs. 66:25 – 67:21 (objection omitted).]

27.    The Marianists knew that its knowledge of prior abuse by Brother Mueller was relevant to not only its defense of the case, but was also relevant to the question of insurance coverage. [Clemenson Affidavit at Ex. 1, pgs. 87:11 – 88:6.]

28.    The Marianists' counsel was aware of ACE's concerns about the Situation at Maryhurst Letter. [Voegele Affidavit at ¶ 10; Clemenson Affidavit at Ex. 5, pgs. 112:7-14.]

29.    Although aware of ACE's concerns, neither the Marianists nor its counsel offered ACE any contrary explanation of the Situation at Maryhurst Letter during the course of the underlying litigation. [Voegele Affidavit at ¶ 10; Clemenson Affidavit at Ex. 1, pgs. 58:12 – 59:19 and 63:1 – 64:7; Clemenson Affidavit at Ex. 5, pgs. 99:22 – 104:4 and 111:6 – 114:15.]

30.    After the underlying cases settled, Mr. Olszewski, the student referred to in the Situation at Maryhurst letter, was deposed in this case and testified that during his sophomore year in high school (1957-58), Brother Mueller would leave notes in Mr. Olszewski's hymnal stating things to the effect of: "I think you are cute," "I am watching you," and "We should get together." [Clemenson Affidavit at Ex. 6, pgs. 8:8-15 and 11:7-24.]

31.    Mr. Olszewski testified that in December of 1957, Brother Mueller entered a chapel where Mr. Olszewski was alone praying and began to talk with Mr. Olszewski about the notes he had been leaving. [Clemenson Affidavit at Ex. 6, pgs. 10:5-19 and 12:4-11.]

32.    Another Marianist Brother entered the chapel shortly after Brother Mueller and discovered Brother Mueller talking with Mr. Olszewski. [Clemenson Affidavit at Ex. 6, pg. 12:14-21.]

33.    Mr. Olszewski was subsequently called into a meeting with two Marianist Brothers who were in charge of Maryhurst. [Clemenson Affidavit at Ex. 6, pgs. 13:22 – 14:25.]

34.    Mr. Olszewski was questioned by the Brothers about his discussion with Brother Mueller and revealed to them that Brother Mueller had been leaving the notes in his hymnal. [Clemenson Affidavit at Ex. 6, pgs. 13:22 – 14:25.]

35.    After the meeting, Mr. Olszewski was transferred by the Marianists away from Maryhurst. [Clemenson Affidavit at Ex. 6, pgs. 15:1 – 17:11.]

### Knowledge of Abuse at St. John Vianney High School

36.    In 1962, Brother Mueller was assigned to be the music teacher at St. John Vianney High School ("Vianney") in St. Louis, Missouri, where he taught until sometime in 1966. [Clemenson Affidavit at Ex. 1, pgs. 32:18 – 33:7; Clemenson Affidavit at Ex. 7, pgs. 13:2-17.]

37.    In February 2007, ACE learned about a 2005 police report that had been filed in Missouri alleging that the Marianists had been told about sexual misconduct by Brother Mueller back in the 1960s. [Voegele Affidavit at ¶ 11, Exs. 6 and 7.]

38.    The source of ACE's information included an article in the Rocky Mountain News, which stated (in part):

> The Marianist religious order said it will look into how a former brother accused in more than 20 lawsuits of sexual abuse was transferred to Colorado from Missouri in the 1960s.
>
> The *Pueblo Chieftain* reported in its Thursday editions that a 56-year old St. Louis man filed a police report in Kirkwood, Mo. in 2005, alleging that William Mueller sexually assaulted him while he attended Vianney High School from 1965 to 1969.
>
> According to the report, which was obtained by the newspaper, the man told a school administrator about Mueller's activities in late 1965 and early 1966. The man told police that Mueller used ether on him – a tactic alleged in the Colorado lawsuits – on three occasions. The former student said he did not suspect sexual assault until the third incident.

[Voegele Affidavit at ¶ 11 and Ex. 7.]

39.     On March 2, 2007, and on other occasions, ACE wrote to the Marianists asking for information related to the police report.  [Voegele Affidavit at ¶ 12 and Ex. 8.]

40.     The Marianists understood the allegations in the police report were significant with respect to the issue of its prior knowledge.  [Clemenson Affidavit at Ex. 1, pgs. 87:11 – 88:12.]

41.     Neither the Marianists nor its counsel provided the police report to ACE nor did it indicate to ACE that the allegations in the police report were not true.  [Voegele Affidavit at ¶ 12; Clemenson Affidavit at Ex. 1, pgs. 91:5 – 92:6 and 94:9-18.]

42.     The Marianists' counsel testified they did not provide the police report (or other information) to ACE because they did not wish to aid ACE in its consideration of the coverage issues.  [Clemenson Affidavit at Ex. 5, pgs. 102:2-24 and 118:4 – 119:14.]

43.     After the settlement of the underlying cases, the man who filed the police report (Harold Suda) was deposed and testified that Brother Mueller approached him in 1965 telling Mr. Suda that he was doing research for a degree in psychology and wanted Mr. Suda's help. [Clemenson Affidavit at Ex. 7, pgs. 13:2-19.]

44.     Mr. Suda met Brother Mueller after school in the band room and was asked by Brother Mueller to lay down on a table, whereupon Brother Mueller then administered ether to Mr. Suda, rendering him unconscious for 10-15 minutes.  [Clemenson Affidavit at Ex. 7, pgs. 14:11 – 15:19.]

45.     Brother Mueller abused Mr. Suda in a similar fashion on two subsequent occasions.  [Clemenson Affidavit at Ex. 7, pgs. 18:21 – 19:24.]

46.     After the last time, Mr. Suda woke up sick to his stomach and vomiting and noticed that his pants and shirt were unbuttoned.  [Clemenson Affidavit at Ex. 7, pgs. 19:1-8 and 24:8-23.]

47.     Mr. Suda subsequently spoke with the principal at Vianney and disclosed to him that Brother Mueller had knocked him out with ether as part of an "experiment" to obtain an advanced degree. [Clemenson Affidavit at Ex. 7, pgs. 21:3 – 22:12.]

48.     In fact, Brother Mueller was at no time pursuing an advanced degree and was not conducting "experiments" for any legitimate purpose. [Clemenson Affidavit at Ex. 1, pgs. 39:10 – 40:8.]

49.     The principal instructed Mr. Suda to cease participating in these experiments and advised that he would "look into it." [Clemenson Affidavit at Ex. 7, pgs. pgs. 22:15-21.]

50.     Shortly thereafter, in the middle of the school year, Brother Mueller was suddenly transferred away from Vianney. [Clemenson Affidavit at Ex. 7, pgs. pgs. 23:1 – 24:4.]

**F.     Events and Knowledge of Abuse at Roncalli High School**

51.     In August 1966, Brother Mueller was assigned to Roncalli High School in Pueblo, Colorado. [Clemenson Affidavit at Ex. 1, pgs. 33:8-12.]

**Abuse at Roncalli High School**

52.     The underlying plaintiffs, who attended Roncalli High School at times between 1967 and 1971, were deposed in the underlying lawsuit and testified as follows (stated in general chronological order):

a.     Jack Klun testified that in February 1967, Brother Mueller rendered him unconscious with ether for an "experiment" and then sexually abused him, although he could not testify to the nature of the sexual abuse because he was unconscious. [1] [Clemenson Affidavit at Ex. 8.a., pgs. 15:24 – 18:24 and 23:21 – 24:23.]

b.     John Doe #10 testified that in the spring of 1967, Brother Mueller rendered him unconscious with ether or chloroform for an "experiment" and then

---

[1] Mr. Klun's report of his abuse to school officials is discussed below.

sexually abused him, although he could not testify to the nature of the sexual abuse because he was unconscious. [Clemenson Affidavit at Ex. 8.b., pgs. 16:12 – 18:25.]

    c.    John Doe #11 testified that in the spring of 1967 Brother Mueller attempted to sexually assault him after administering him ether, but failed in his attempt because John Doe #11 was not rendered unconscious. [Clemenson Affidavit at Ex. 8.c., pgs. 19:21 – 25:20 and 30:14 – 31:12]

    d.    John Doe #20 testified that in the spring of 1967, he was cleaning a bathroom, fell unconscious, and the next thing he remembered was leaving the Brothers' residences with Brother Mueller and suspects (but does not know) that he was sexually abused. [Clemenson Affidavit at Ex. 8.d., pgs. 21:1 – 22:23, 25:1-20 and 31:22 – 32:2.]

    e.    John Doe #15 testified that in the spring of 1967 Brother Mueller administered ether to him for an "experiment" causing him to go in-and-out of consciousness, but he did not testify to any specific incident of sexual abuse. [Clemenson Affidavit at Ex. 8.e., pgs. 8:9-13 and 16:20 – 20:6.]

    f.    J.M. testified that in the spring of 1968, Brother Mueller rendered him unconscious with some substance for an "experiment," and that when he awoke he determined that he had been sexually abused. [Clemenson Affidavit at Ex. 8.f., pgs. 17:9 – 18-19.]

    g.    John Doe #2 testified during the second semester of his freshman year (1969), Brother Mueller rendered him unconscious with some chemical for an "experiment," and that when he awoke he determined that he had been sexually abused. [Clemenson Affidavit at Ex. 8.g., pgs. 10:17 – 25 and 23:11 – 25:25.]

    h.    T.A. testified that on two occasions in March 1969, Brother Mueller rendered him unconscious with ether for an "experiment," but that he still recalled

Brother Mueller sexually abusing him by touching his genitals. [Clemenson Affidavit at Ex. 8.h., pgs. 30:19 – 32:20; 37:10 – 38:9.]

     i.     John Doe #5 testified that during the summer of 1969, he was cleaning a classroom when Brother Mueller came up from behind and rendered him unconscious with ether, although he could not testify to the nature of the subsequent sexual abuse because he was unconscious. [Clemenson Affidavit at Ex. 8.i., pgs. 10:14 – 17 and 23:10 – 25:9.]

     j.     John Doe #18 testified that in the winter of 1969, Brother Mueller rendered him unconscious with ether or chloroform for an "experiment" and then (presumably) sexually abused him, although he could not testify to the nature of the sexual abuse because he was unconscious. [Clemenson Affidavit at Ex. 8.j., pgs. 23:7 – 27:20.]

     k.     John Doe #16 testified that in the fall of 1969, Brother Mueller rendered him unconscious on two separate occasions for an "experiment" and then (presumably) sexually abused him, although he could not testify to the nature of the sexual abuse because he was unconscious. [Clemenson Affidavit at Ex. 8.k., pgs. 15:20 – 23 and 23:3 – 25:14.]

     l.     John Doe #4 testified that in October 1969, Brother Mueller rendered him unconscious on several occasions for an "experiment" and then sexually abused him (*e.g.*, Brother Mueller used his penis to hit John Doe #4 on the mouth, cheeks and nose). [Clemenson Affidavit at Ex. 8.l., pgs. 14:2 – 19:25; 22:17 – 23:8.]

     m.     John Doe #6 testified that from September 1969 until the close of Roncalli High School in 1971, Brother Mueller would publicly bully, insult, verbally abuse and sexually abuse him (by placing his hands on his lower waist, lean against his backside

and zip up his pants after making him tuck his shirt tails in). [Clemenson Affidavit at Ex. 8.m., pgs. 11:5-12 and 13:1 – 14:17.]

n.     John Doe #19 testified that during a four to eight month period from the middle of 1969 to 1970, Brother Mueller would render him unconscious with ether for an "experiment" and then (presumably) sexually abuse him, although he could not testify to the nature of the sexual abuse because he was unconscious. [Clemenson Affidavit at Ex. 8.n., pgs. 12:4 – 13:18, 17:22 – 18:9 and 20:13 – 21:8.]

o.     Donald Jesik testified that in March or April of 1970, Brother Mueller rendered him unconscious with ether and sexually abused him. [Clemenson Affidavit at Ex. 8.o., pgs. 24:20 – 27:8 & Ex. 1, answer 4.]

p.     John Doe #9 testified that in the spring of 1970, Brother Mueller, after asking him to help with a project after school, accosted him and rendered him unconscious with some substance and then (presumably) sexually abused him (he woke with something wet in his underwear). [Clemenson Affidavit at Ex. 8.p., pgs. 16:2 – 19:21.]

q.     John Doe #13 testified that in the fall of 1970, Brother Mueller touched his genitals and possibly raped him, although he had no specific recollection of the abuse and presumes a chemical was used to subdue him. [Clemenson Affidavit at Ex. 8.q., pgs. 14:21 – 21:3.]

r.     John Doe testified that in the fall of 1970, Brother Mueller rendered him unconscious with ether or chloroform for an "experiment" and then (presumably) sexually abused him (when he awoke his genitals were raw and sore). [Clemenson Affidavit at Ex. 8.r., pgs. 20:19 – 24:23.]

s.      John Doe #8 testified that in November 1970, Brother Mueller rendered him unconscious with chloroform for an "experiment" and then sexually abused him. [Clemenson Affidavit at Ex. 8.s., pgs. 17:24 – 18:20 and 19:19 – 24:8.]

t.      John Doe #3 testified that during his only year at Roncalli (1970-71), Brother Mueller would render him unconscious with ether, but that he does not know what occurred while he was unconscious. [Clemenson Affidavit at Ex. 8.t., pgs. 10:10-17 and 22:24 – 23:21.]

u.      John Doe #14 testified that sometime between November 1970 and February 1971, Brother Muller rendered him unconscious with some chemical for an experiment and then (presumably) sexually abused him, although he could not testify to the nature of the sexual abuse because he was unconscious. [Clemenson Affidavit at Ex. 8.u., pgs. at 18:13-15, 22:1 – 24:9 and 25:12-26:4.]

v.      John Doe #12 testified that in February 1971, Brother Mueller rendered him unconscious with ether for an "experiment" and then sexually abused him. [Clemenson Affidavit at Ex. 8.v., pgs. 17:18 – 21:8.]

w.      John Doe #17 testified that in spring of 1971, Brother Mueller grabbed him from behind after band practice, rendered him unconscious with ether or chloroform and then (presumably) sexually abused him, although he could not testify to the nature of the sexual abuse because he was unconscious. [Clemenson Affidavit at Ex. 8.w., pgs. 20:13 – 22:13 and 23:25 – 24:9.]

### Report of Abuse to Marianists by Jack Klun

53.    Jack Klun attended Roncalli High School from 1965 until he graduated in 1968. [Voegele Affidavit at Ex. 9.]

54.    Mr. Klun was deposed in the underlying lawsuits and a summary of that deposition was received by ACE prior to the settlement of the underlying cases. [Voegele at ¶ 13 and Ex. 9.]

55.    The deposition summary reviewed by ACE stated, in pertinent part:

... [Mr. Klun] went to Roncalli 1965-68 which were his sophomore, junior and senior years. ...

His incident with Mueller occurred in the middle of February his junior year. Mueller asked him if he would help him with a paper he was doing. Mueller asked him to come back to school after hours. It happened mid week. He went to school at about 8 p.m. one night. He went in to the school and Mueller met him. Mueller emphasized the need for trust and secrecy. Mueller took him into a closet. Mueller told him he was going to put him under. Jack recognized the smell of ether as the substance used to knock him out. He has no idea how long he was unconscious. He remembers when he was coming out of the ether that he didn't feel "right". He remembers Mueller being there asking if he was "okay". He remembers Mueller telling him not to tell anyone about experiment. He remembers that his belt was loose and that his shirt was untucked. He remembers discomfort in his crotch area. ...

The next week Mueller asked him if he wanted to participate in experiment again. He didn't want to tell a brother "no" so he agreed to participate. The second incident was pretty much the same except this time, Jack pretended to get very sick and Mueller stopped. ...

He told Fr. Montoya about the incidents. He told him about the ether but did not tell him about the possible sexual abuse. Montoya told him not to be with Mueller alone again. ...

[Voegele Affidavit at ¶ 13 and Ex. 9 (emphasis added).]

56.    Mr. Klun was deposed in this case and testified to generally the same facts as described in the deposition summary – i.e., that he was ethered by Brother Muller under the guise of a legitimate experiment, that when he awoke his belt and shirt were "not right" and he had discomfort in his genitals, that he escaped a second incident of abuse by feigning sickness, and that he revealed being rendered unconscious with ether to Fr. Montoya. [Clemenson Affidavit at Ex. 9, pgs. 21:7 – 22:23, 25:4 – 27:13, 29:19 – 31:8 and 31:22 – 35:14].

57.     Fr. Jose Montoya was a Diocesan priest working as a guidance counselor at Roncalli High School. [Clemenson Affidavit at Ex. 9, pgs. 31:22 – 35:14.]

58.     The contract between the Marianists and the Bishop provided that Diocesan priests worked under the jurisdiction of the school principal (a Marianist), and that the Marianist principal had the right to assign duties to all school personnel. [Clemenson Affidavit at Ex. 1, pgs. 95:8 – 96:25 and Ex 9.]

59.     According to the Marianists, one of the duties assigned to school counselors, such as Fr. Montoya, was to address issues that arose between students and teachers:

> Q.     And so if a student at Roncalli High School had an issue with a teacher that he wanted to discuss, the guidance counselor would be one of the people that that student would be expected to discuss matters with?
>
> A.     One of them, sure.
>
> Q.     And that's exactly what Mr. Klun did, correct?
>
> A.     Correct.

[Clemenson Affidavit at Ex. 1, pgs. 110:6 – 14.]

G.     <u>**Other Knowledge of Abuse (Relevant to Allegations of Bad Faith)**</u>

60.     The Marianists and its counsel continually represented to ACE that the Marianists had no knowledge of misconduct by Brother Mueller until around 1983, when he was first removed from his academic position. [Voegele Affidavit at ¶ 16.]

61.     However, while considering the liability and coverage issues during the underlying litigation, ACE reviewed documents provided by the Marianists that indicated the Marianists may have had knowledge of misconduct by Brother Mueller long before 1983. [Voegele Affidavit at ¶ 9 and Exs. 5.a – 5.f.]

### Report of Abuse by Brother Bommer

62.     One such document was a Marianist memorandum regarding an interview conducted with Brother Jerry Bommer, the former Director of Religious Community at Roncalli High School. [Voegele Affidavit at ¶ 9 and Ex. 5.b.]

63.     The memorandum stated that just before Brother Bommer left Roncalli High School in the spring of 1971, a Diocesan priest called him and reported that that Brother Mueller was "giving kids ether," and that Brother Bommer "thought it might be sexual." [Voegele Affidavit at Ex. 5.b.]

64.     The memorandum further stated that Brother Bommer called the Provincial office and repeated the priest's accusations to Fr. Robert Sargent, the Marianists' Assistant for Religious Life. [Voegele Affidavit at Ex. 5.b.]

65.     Although Fr. Sargent apparently denied receiving the call, ACE was advised by the Marianists' counsel that Brother Bommer had confirmed during his underlying deposition that he had spoken with Fr. Sargent about the abuse accusations. [Voegele Affidavit at ¶¶ 9 & 15 and Ex.5.c. & Ex. 10.]

### Report of Abuse to the Marianists by the ROTC

66.     Another document evidencing possible earlier knowledge of abuse was a letter from Brother DuWayne Brisendine in which Brother Brisendine recounted that during the second semester of 1974, an ROTC officer informed him that students were reporting to their ROTC instructors "strange things" happening between them and Brother Mueller. [Voegele Affidavit at ¶ 9 and Exs. 5.d. & 5.e.]

67.     Brother Brisendine was the principal of Central Catholic High School ("CCHS"), the Marianist-run high school in San Antonio, Texas, to which Brother Mueller had been assigned after Roncalli High School closed. [Voegele Affidavit at ¶ 9 and Ex. 5.d.; Clemenson Affidavit at Ex. 1, pgs. 130:6-17.]

68.     Brother Brisendine also stated in his letter that the ROTC made similar reports to his successor. [Voegele Affidavit at ¶ 9 and Ex. 5.d.]

### Abuse Reported by Brother Robert Rapp

69.     Another document ACE reviewed while considering the liability and coverage issues was a summary of an interview the Marianists conducted with Brother Robert Rapp. [Voegele Affidavit at ¶ 9 and Ex. 5.f.]

70.     According to the interview summary, Brother Rapp reported in 1974-75 that students were accusing Brother Mueller of doing "weird things" involving chloroforming and masturbation:

> In the 1974-75 school year, Bob Rapp was a teacher at CCHS.  Greg Benkowski was a Marianist brother also teaching at CCHS.  Greg told Bob that his freshman & sophomores were telling him about weird things Bill Mueller was doing (including chloroforming and masturbation). Mueller told the kids he was doing the experiments for the SM order.

> Greg asked Bob Rapp to go with him to talk to the late Brother Robert Godfrey, who was then principal of CCHS.  They told Brother Godfrey everything.  Bro. Godfrey told them that Fr. Quentin Hackenwerth (provincial) would be coming in to handle it.  Several days later, Fr. Quentin came to San Antonio & spoke with Godfrey.  William Mueller remained at CCHS.

> In 1981-82, Bob Rapp was director in E. St. Louis.  Bob said he was "pissed off" that Bill Mueller was appointed principal of St. Mary's after what he had done at CCHS. ... he said it was like sending "a fox into the chicken coop."  Bob said words to this effect to Dan Sharpe, but received only a shrug.  At the time, Dave Fleming was provincial & Dan Sharpe was asst provincial.

[Voegele Affidavit at Ex. 5.f. (ellipses in original)]

71.     Neither the Marianists nor their counsel provided ACE with any information calling into question Brother Rapp's report. [Voegele Affidavit at ¶ 14.]

## H.   Termination of Brother Mueller

72.     In 1981, the Marianists appointed Brother Mueller as the principal of St. Mary's High School in St. Louis, Missouri. [Clemenson Affidavit at Ex. 1, pgs. 33:18-20.]

73.     In 1983, one of the faculty members at St. Mary's High school went to Fr. David Fleming, the Provincial, and reported that Brother Mueller was involved in "bizarre behavior" towards students. [Clemenson Affidavit at Ex. 10, pg. 38:11-21.]

74.     Fr. Fleming, who later became the Superior General of the Marianist Order (*i.e.*, the worldwide head), called Brother Mueller into the Provincial office and questioned him about his "bizarre behavior." [Clemenson Affidavit at Ex. 10, pgs. 4:14-19 and 38:11-21.]

75.     Brother Mueller admitted to Fr. Fleming that he was chloroforming students. [Clemenson Affidavit at Ex. 10, pg. 38:22-25.]

76.     Upon hearing this, Fr. Fleming told Brother Mueller:

> You cannot continue in your work because of this action, this kind of action, and so you should be immediately removed.  You are immediately removed, and I want your resignation as Principal[.]
>
> * * *
>
> I will move you into a program of psychological and spiritual treatment to overcome, or to deal with this unacceptable behavior.

[Clemenson Affidavit at Ex. 10, pg. 39:1-8.]

77.     In his role as a 30(b)(6) witness, Fr. Fleming also testified:

> Q.   Now, you removed him from his position and demanded his resignation, correct?
>
> A.   Correct.
>
> Q.   And you did this not because you suspected sexual abuse but because his conduct in rendering students unconscious under the guise of a legitimate experiment was conduct that was unacceptable for a Marianist to be involved in?
>
> A.   Well, it seems to me there are two parts.  It's correct to say that I thought that using any chemical was plenty of grounds to remove him.  Secondly, if there had been any sexual misconduct, despite his denials, that would have been an additional reason.

[Clemenson Affidavit at Ex. 11, pgs. 25:18 – 26:12 (emphasis added).]

78.    Brother Glodek agreed that ethering or chloroforming students under the guise of conducting a legitimate experiment was unethical and improper conduct and grounds for removing Brother Muller from his position back in 1960.  [Clemenson Affidavit at Ex. 1, pgs. 40:9 – 41:13.]

79.    Brother Mueller resigned as requested and was sent for treatment with the Servants of the Paraclete. [Clemenson Affidavit at Ex. 10, pg. 58:2-21.]

80.    In 1984, the Marianists again placed Brother Mueller in a teaching position, whereupon he resumed his abusive conduct.  [Clemenson Affidavit at Ex. 10, pgs.  58:22 – 59:18.]

81.    The Marianists removed Brother Mueller from that position and he left the Marianists shortly thereafter. [Clemenson Affidavit at Ex. 10, pgs. 60:20 – 61:16.]

82.    ACE attempted to depose Brother Mueller, but he asserted his Fifth Amendment privilege against self-incrimination to every substantive question. [Clemenson Affidavit at ¶ 13.]

[END OF MOVANT'S STATEMENT OF MATERIAL FACT]

**ARGUMENT AND AUTHORITY**

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact that that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

**A.     The Marianists' failure to prevent Brother Mueller from abusing students is not an "occurrence."**

As is relevant here, ACE's Policies limit coverage to damages because of "personal injury" caused by an "occurrence." [Facts ¶ 8.] There is no dispute that the underlying plaintiffs testified to "personal injury" (*i.e.*, bodily injury and resulting emotional distress) because they generally testified that Brother Mueller assaulted them by drugging them and (allegedly) sexually abusing them while they were unconscious. [Facts ¶ 52.]

Although the underlying plaintiffs may have claimed "personal injury," that "personal injury" was not caused by an "occurrence." With respect to claims of "personal injury," ACE's Policies define an "occurrence" as "an accident happening during the coverage period." [Facts ¶ 10.][2] The "accident" for which the Marianists seek coverage is its negligent supervision of Brother Mueller, thereby permitting him to assault the underlying plaintiffs. It is indisputable that Brother Mueller's assaults (which are intentional torts) were the immediate cause of the underlying plaintiffs' injuries.

An underlying plaintiff's bodily injury cannot be caused by an "occurrence" if the immediate cause of that injury was an intentional act. *Mountain States Cas. Co. v. Hauser*, 221 P.3d 56, 60-61 (Colo App. 2009). In *Hauser*, a restaurant manager sexually assaulted a waitress. *Hauser*, 221 P.3d at 58. The waitress sued the restaurant, alleging that the restaurant had

---

[2] ACE's Policies <u>do not</u> include language expanding the applicable definition to include "continuous or repeated exposure to conditions" or to require that the injury be caused "unexpectedly or unintentionally." [Facts ¶ 10.] Such language is limited to claims of property damage. [*Id.*]

negligently hired, supervised, and retained the restaurant manager. *Id.* In turn, the restaurant's

liability insurance company filed a lawsuit against the restaurant, seeking a judgment declaring

that it owed no duty to cover the restaurant for the waitress's lawsuit. *Id.* The Court allowed the

waitress to intervene as the "insured." *Id.* The insurance company and the waitress then filed

cross-motions for summary judgment, and the trial court entered an order declaring that the

insurance company owed no duty to cover the restaurant with respect to the waitress' allegations.

*Id.*

On appeal, the *Hauser* court observed that the insurance policy applied to the plaintiff's

injuries only if her injuries were caused by an "occurrence." *Hauser*, 221 P.3d at 59. The Court

observed that the insurance policy defined "occurrence" as "an accident, including continuous or

repeated exposure to substantially the same general harmful conditions." *Id.* The waitress

maintained her bodily injury had been caused by an "occurrence," arguing that "even though [the

restaurant manager's] conduct was clearly intentional, the assault was accidental from [the

restaurant's] point of view." *Id.* at 60. The court rejected the waitress' argument:

> We are not persuaded that the plain meaning of either "occurrence" or
> "accident" encompasses this intentional assault, even if negligent hiring,
> negligent supervision, or negligent retention [of the restaurant manager]
> created the potential for [the waitress] to be injured.

*Hauser*, 221 P.3d at 60.

In reaching its conclusion, the Court adopted the Tenth Circuit's reasoning in *Farmers*

*Alliance Mut. Ins. Co. v. Salazar*, 77 F.3d 1291 (10th Cir. 1996):

> [It is] "well-settled . . . that the time of an occurrence of an accident within
> the meaning of a liability indemnity policy, is not the time when the
> wrongful act was committed, but the time when the complaining party was
> actually damaged. ... [W]hen determining whether a bodily injury was
> 'caused by an occurrence' the <u>question of whether there was an</u>
> <u>'occurrence' should be resolved by focusing on the injury and its</u>
> <u>immediately attendant causative circumstances.</u>

*Hauser*, 221 P.3d at 60 (quoting *Salazar*, 77 F.3d at 1294) (emphasis added). The Court then observed that the immediate cause of the waitress' injury was necessarily the restaurant manager's intentional misconduct, and declared that the intentional misconduct could not constitute an "occurrence." *Id.* at 60-61. Therefore, the Court concluded that the insurance policy could not and did not cover the waitress' lawsuit against the restaurant. *Id.* at 62.

The *Hauser* decision is dispositive of this case. Brother Mueller, like the restaurant manager, is alleged to have assaulted (including sexually assaulted) the underlying plaintiffs. The Marianists, like the restaurant, was sued for negligent supervision of a sex abuser in its employ. ACE, like the insurer, should be granted summary judgment that there was no "occurrence."

If there is no "occurrence," then there is no coverage. Without coverage, ACE could not have acted in bad faith. *Lira v. Shelter Ins. Co.*, 913 P.2d 514, 516-16 (Colo. 1996); *Farmers Alliance Mut. Ins. Co. v. Cutrone*, 448 F. Supp.2d 1226, 1234 (Colo. 2006). The Court should dismiss all of the Marianists' claims against ACE.

**B.** **There is no "occurrence" because the Marianists knew, prior to the inception of ACE's policies, of abuse by Brother Mueller.**

Even if the Marianists' failure to supervise Brother Mueller and prevent him from committing intentional acts could constitute an "occurrence," there is still no "occurrence" here because the Marianists had actual knowledge of misconduct by Brother Mueller before ACE's Policies incepted. The undisputed facts in this regard are:

- The Marianists were told in 1957 that Brother Mueller was leaving notes for a young student telling him that he was attractive and that Brother Mueller wanted to meet up with him. [Facts ¶¶ 30-34.]

- A student reported to the Marianists in 1966 that Brother Mueller had drugged him with ether under the guise of a legitimate experiment, rendering him unconscious. [Facts ¶¶ 47-48.] Before the end of the school year, Brother Mueller mysteriously left the school. [Facts ¶ 50.]

- The next fall, Brother Mueller was assigned by the Marianists to teach in a different school in a different state. [Facts ¶ 51.] Brother Mueller's abusive conduct continued, and in 1967 a Roncalli High School student reported identical misconduct to a school guidance counselor for the Marianists (*i.e.*, that the student had been knocked out with ether by Brother Mueller under the guise of a legitimate experiment). [Facts ¶¶ 53-59.]

Thus, before ACE's Policies incepted, the Marianists <u>knew</u> that: (1) Brother Mueller left inappropriate notes laced with sexual innuendo for a minor student; (2) under false pretenses, Brother Mueller had drugged another student with ether, rendering him unconsciousness; and (3) after being transferred to a new school, Brother Mueller again administered ether to a student under false pretenses, also rendering him unconscious. The Marianists admit ethering students was grounds for removing Brother Mueller from his position. [Facts ¶¶ 75-78.] Indeed, this is the stated reason he was eventually removed. [Facts ¶¶ 77.]

The Marianists' knowledge that Brother Mueller was drugging and abusing his students means there could be no "occurrence" or "accident" under ACE's Policies. An "accident" is an "unanticipated or unusual result" or an "unforeseen unplanned event." *Mountain States Cas. Co. v. Hauser*, 221 P.3d 56 (Colo. App. 2009) (citations omitted).[3] Once the Marianists had knowledge of Brother Mueller's abusive conduct, any subsequent abuse and resulting harm is not an "unanticipated or unusual" result. *Hauser*, 221 P.3d at 61 (once insured knew of employee's abusive propensities there was no "occurrence" for subsequent abuse); *Diocese of Winona v. Interstate Fire & Cas. Co.*, 89 F.3d 1386 (8th Cir. 1996) (negligent supervision claim did not allege an "occurrence" where Diocese knew of priest's prior abuse); *Cincinnati Ins. Co. v. Oblates of St. Francis de Sales, Inc.*, 2010 WL 3610451 (Ohio App. 2010) (same).

Any argument that there is an "occurrence" because the Marianists "only" knew Brother Mueller was drugging students, and not that he was further assaulting them while they were

---

[3] Missouri law, which defines an "accident" as "an undesigned and unforeseen occurrence," is in accord. *Hampton v. Carter Enterprises, Inc.*, 238 S.W.3d 170, 175 (Mo. App. 20007).

unconscious, is unavailing.  The facts indisputably show that drugging students and any sexual abuse were parts of the same uninterrupted course of conduct.  The act of drugging students, in-and-of-itself, was inherently harmful and should have caused the Marianists to remove Brother Muller.  [Facts ¶¶ 76-78.]  Removing Brother Mueller for his known misconduct would have protected students from his further misconduct while they were unconscious.

Similarly, any argument that ethering and sexual abuse should be considered separately violates the inseparability doctrine.  The inseparability doctrine holds that if covered and uncovered conduct are inseparable in time and space, there is no coverage. *Bohrer v. Church Mut. Ins. Co.*, 965 P.2d 1258, 1264-65 (Colo. 1998); *Cole v. State Farm Fire & Cas. Co.*, 2002 WL 21784 (10th Cir. 2002).  *See also, Nodak Mut. Ins. Co. v. Heim*, 559 N.W.2d 846 (N.D. 1997) (recognizing and applying doctrine).  Both *Bohrer* and *Cole* are analogous to this case.

In *Bohrer*, a twelve-year-old girl (Bohrer) sought counseling from her church's youth minister. *Id.* at 1260.  After approximately two years, the youth minister began an inappropriate sexual relationship with the then fourteen-year-old Bohrer. *Id.*  He continued to sexually abuse her for another three years, after which she finally reported the abuse. *Id.*  After obtaining a civil judgment against the youth minister and the church, Bohrer initiated a garnishment proceeding against the church's insurer. *Id.* at 1260-61.  The trial court denied her request for garnishment, a decision affirmed by the court of appeal because her covered claims (counseling) were so intertwined with her uncovered claims (sexual misconduct) as to render them inseparable, and therefore excluded from coverage. *Id.* at 1260.

The Colorado Supreme Court affirmed in part, and reversed in part, the court of appeals. Significantly, the Court agreed with the court of appeals that covered conduct and uncovered conduct could (and did) become so intertwined in time and space so as to render them inseparable. *Bohrer*, 965 P.2d at 1264-65.  Accordingly, the Court affirmed that no coverage was available for that period of time where the youth minister was engaged in both counseling

(covered conduct) and sexual misconduct (uncovered conduct), remanding only for a determination of what damages could be allocated to inappropriate counseling before the sexual misconduct began. *Id.*

A similar result was reached in *Cole* where the Tenth Circuit affirmed the district court's grant of summary judgment on a duty to defend claim where the insured attempted to separate potentially covered conduct (false imprisonment) from uncovered conduct (sexual assault). *Id.* at *4-5. Finding that restraint was an "integral part" of the overall assault, the Tenth Circuit ruled, as a matter of law, that because the false imprisonment and sexual assault occurred in such a close temporal and spatial relationship, they were inseparable and coverage was defeated. *Id.*

Both *Bohrer* and *Cole* compel a similar result here. The ethering by Brother Mueller (conduct not covered because the Marianists knew about it) and the sexual abuse by Brother Mueller (conduct the Marianists argue they did not know about) are inseparable in time and space, and the ethering was integral to the sexual abuse. The Marianists' knowledge that Brother Mueller was drugging students therefore preludes coverage for his further sexual abuse while his students were unconscious. This inseparability is further evidenced by the Marianists' failure to allocate damages between types of abuse. [Facts ¶ 19.]

In sum, the Marianists knew, before ACE's Policies incepted, that Brother Mueller was a danger to his students. His continued misconduct during ACE's Policies was not unanticipated or unusual, and therefore not an "occurrence." ACE is entitled to summary judgment dismissal of all of the Marianists' claims, including its extra-contractual claims.

**C.     ACE paid more than its policy limits based on the number of occurrences.**

Even if there was an "occurrence," which there was not, ACE paid more in settlement than was required under its Policies. ACE's Policies provided limits of $100,000 per person, capped at $300,000 per occurrence per policy year. [Facts ¶¶ 11-12.] ACE's Policies also provided that:

> All injury or damages arising out of substantially the same general conditions
> shall be considered as arising out of one occurrence.

[Facts ¶10.]

Although ACE and the Marianists may have settled claims asserted by 23 individual plaintiffs, there was but a single "occurrence" because all of the underlying plaintiffs' injuries arose out of the "same general condition" – the Marianists' negligent supervision of Brother Mueller. [*See*, Facts ¶ 3.] Consequently, even though as many as nine different plaintiffs may have been abused in any particular policy year (theoretically implicating nine $100,000 per person limits), the available limits that year are capped the per occurrence limit of $300,000.

What this effectively means is that once Brother Mueller abused three persons in a given policy year, thereby implicating three separate $100,000 per person limits,[4] ACE's exposure was capped at the $300,000 per occurrence limit.  An examination of the testimony of the underlying plaintiffs as to when their abuse incident(s) occurred reveals the following:

| Period in Which Abuse Incident Occurred | # of Plaintiffs Abused During Period | Policy Limits Implicated During Period |
|---|---|---|
| During 1st yr of First Policy | 1 | $100,000 per person |
| During 2nd yr of First Policy | More than 3 | $300,000 per occurrence |
| During 3rd yr of First Policy | More than 3 | $300,000 per occurrence |
| During 1st yr of Second Policy | More than 3 | $300,000 per occurrence |
| During 2nd yr of Second Policy | 0 | n/a |

[Facts ¶ 52.]

Thus, ACE Policies were triggered for, at most, $1,000,000 in limits.  ACE paid $1,350,000 in settlement, which is more than was legally required. [Facts ¶ 17.] Having already paid more than was legally required, ACE cannot be held liable for breach of contract or for

---

[4] The Marianists and ACE combined to pay more than $100,000 to each underlying plaintiff (over $2.35 million paid to 23 plaintiffs), so the per person limit was achieved for each plaintiff. [Facts ¶ 17.]

supposed "bad faith" in failing to pay even more. ACE is entitled to summary judgment dismissal of the Marianists' coverage claims and its extra-contractual claims.

**D.      ACE had no duty to defend or indemnify the claims of the five underlying plaintiffs who were abused before ACE's Policies incepted.**

The time of an "occurrence" is not the time when the wrongful act was committed, but the time when the complaining party was injured. *Hauser*, 221 P.3d at 60. Each of the underlying plaintiffs was unquestionably injured at the time they were assaulted. Four underlying plaintiffs alleged in their complaint, and subsequently testified, that they were abused in 1967, which is before ACE's Policies incepted. [Facts ¶¶ 3 and 52.a.-d.] Because ACE's Policies only cover accidents happening during their policy periods, [Facts ¶ 8], ACE's Policies did not provide coverage for those four claims. ACE is entitled to summary judgment dismissal of the Marianists' claims for defense costs and indemnity payments with respect to those four plaintiffs.

Similarly, after filing a complaint that did not specifically allege a date of abuse, John Doe #15 testified that his abuse also occurred in 1967, before ACE's Policies incepted. [Facts ¶ 52.e.] ACE is entitled to summary judgment dismissal of the Marianists' claims related to John Doe #15.

**E.      There is no evidence that ACE was required to pay 100% of the settlement, defeating the Marianists' extra-contractual claims.**

**1.      Missouri law applies to the Marianists' extra-contractual liability claims.**

Initially, there is a conflict of law between Missouri and Colorado with respect to an insurer's extra-contractual liability that may be outcome determinative. Colorado permits "bad faith" claims to be proven based solely upon principals of negligence. *Goodson v. American Standard Ins. Co. of Wisconsin*, 89 P.3d 409, 414 (Colo. 2004); C.R.S. § 10-3-1113(2). In contrast, negligence is insufficient to give rise to a bad faith claim in Missouri. *Zumwalt v. Utilities Ins. Co.*, 228 S.W.2d 750, 753 (Mo. 1950). Instead, bad faith in Missouri is a state of

mind variously described as "intentional disregard of the financial interests of the insured" or the failure "to make any settlement within the policy limits that an honest judgment and discretion dictates." *Landie v. Century Indem. Co.*, 390 S.W.2d 558, 563 (Mo. App. 1965). Although ACE believes it is entitled to summary judgment even under Colorado's negligence standards, it is entitled to have its conduct judged based on Missouri law in the event there is a difference.

The Marianists have also asserted Colorado statutory law claims against ACE for its claims handling. These statutes should not apply to conduct appropriately judged under Missouri law; rather, only Missouri's vexatious refusal to pay statute (V.A.M.S. § 375.420) should apply to judge ACE's conduct. There is a significant difference because Missouri's statute applies only if the denial of claims was "willful and without reasonable cause." *New Madrid County Reorganized School Dist. No. 1, Enlarged v. Continental Cas. Co.*, 904 F.2d 1236 (8th Cir. 1990) Colorado's statutes, on the other hand, can apply to less culpable conduct. *See*, C.R.S. § 10-3-1116(1) (premised on "unreasonably" delayed or denied claims) and C.R.S. § 10-3-1104 as applied through C.R.S. § 6-1-105 (deceptive acts or practices under CCPA may be based on reasonableness).

To resolve whose law applies, the Court must apply Colorado's choice-of-law rules since Colorado is the forum state. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941). Colorado's choice of law rules for bad faith are based upon the "most significant relationship" test set forth in the Restatement (Second) of Conflict of Laws (the "Restatement"), in particular, sections 6 and 145. *AE, Inc. v. Goodyear Tire & Rubber Company*, 168 P.3d 507, 510 (Colo. 2007). Section 6 of the Restatement sets forth principles for courts to consider in determining choice of law, including: the needs of the interstate and international systems, the relevant policies of the forum and other interested states, protection of justified expectations, the basic policies underlying the particular field of law, predictability and uniformity of result, and ease of determination and application of the law to be applied. In determining which state has more

significant contacts, the Court should consider the following contacts, evaluated according to their relative importance, in light of the foregoing principals: (a) the place where the injury occurred; (b) the place where the conduct causing the injury occurred, (c) the domicil, residence, nationality, place of incorporation and place of business of the parties, and (d) the place where the relationship, if any, between the parties is centered. Restatement § 145.

Applying these factors to the specific facts of this case, Missouri unquestionably has the most significant relationship to the extra-contractual issues:

- The Marianists' claimed injury is the payment of defense costs and settlement funds that it believes ACE should have paid. Those payments were directed from the Marianists' Missouri headquarters, not from Colorado. Thus, the Marianists' injury occurred in Missouri, not Colorado.

- The conduct causing the Marianists' alleged injury was ACE's decision not to fund the entire settlement, a decision made by ACE in Pennsylvania, not Colorado or Missouri.

- The Marianists are a Missouri corporation headquartered in Missouri. ACE is a Pennsylvania corporation headquartered in Pennsylvania.

- The relationship of the parties is centered in Missouri. The "bad faith" claims in this action, although statutory or sounding in tort, are ultimately based upon the alleged breach of Missouri contracts. The Policies have multiple Missouri-specific endorsements and refer to Marianist properties located in Missouri. They never mention Colorado.

Missouri is the state where the Marianists are located, the place where their alleged injury occurred and the place where the parties' relationship was centered. On the other hand, the only relationship the state of Colorado has with the extra-contractual claims is that the underlying plaintiffs chose to sue the Marianists here, rather than in Missouri. This is insufficient to subject ACE to Colorado claim handling laws. Consequently, Missouri law applies.

2.    **The Marianists have not come forward with evidence of bad faith.**

It is axiomatic that an insurer has no obligation to pay or settle claims falling outside the scope of its coverage. *E.g.*, *Grobe v. Vantage Credit Union*, 679 F. Supp.2d 1020, 1034 (E.D. Mo. 2010). *Accord, Lira*, 913 P.2d at 517. For this reason, an insurer does not act in bad faith when an insured participates with the insurer in resolving claims that may or may not be covered by insurance. *Esicorp, Inc. v. Liberty Mut. Ins. Co.*, 193 F.3d 966, 970-71 (8th Cir. 1999) (even if insurer fails to defend, resulting judgment must still be apportioned between covered and uncovered claims); *Shaffer v. Federated Mut. Ins. Co.*, 903 S.W.2d 600, 608 (Mo. App. 1995) ("Where there is an open question of law or fact, the insurer may insist on a determination without being penalized."). *Accord, Lira*, 913 P.2d at 517 (insurer cannot be held liable for breach of a duty which it did not have in the first place). Further, an insurer's conduct cannot be judged through the lens of hindsight; it must be judged according to the information available to it at the time of its action. *Groves v. State Farm Mut. Auto. Ins. Co.*, 540 S.W.2d 39, 42 (Mo. 1976). *Accord, Anderson v. State Farm Mut. Auto. Ins. Co.*, 416 F.3d 1143, 1147-48 (10th Cir. 2005) (citations omitted).

The Marianists claim that ACE acted in bad faith because the Marianists had to participate in funding the underlying settlements which, according to the Marianists, were fully covered by ACE's Policies. [Facts ¶ 20.] However, the Marianists have not come forward with any facts supporting their position that, at the time of settlement, all of the underlying claims were unquestionably covered. In fact, the opposite is true. The information ACE possessed indicated that it was likely the claims were not covered because it appeared the Marianists knew, before ACE's Policies incepted, that Brother Mueller had engaged in sexual misconduct and, consequently, that there was no "occurrence." Specifically, at the time the underlying litigation was settled, ACE possessed the following information:

- In April 1960, long before ACE's policies incepted, a Marianist Brother wrote to the head of the Marianist Order asking that Brother Mueller not be assigned to his

school because an "unfavorable situation" could result due to a prior "situation at Maryhurst" involving Brother Mueller and a student. [Facts ¶¶ 22-24.] The Marianists refused to explain the "situation at Maryhurst" to ACE even though the Marianists knew ACE's believed that the Situation at Maryhurst Letter evidenced prior knowledge of abuse. [Facts ¶¶ 25-29.]

- From a news article, ACE learned that a police report had been filed in 2005 alleging that in 1965-66 (before ACE's Policies incepted), Brother Mueller had drugged and sexually assaulted a student. [Facts ¶¶ 37-38.] The article indicated that the student had reported the abuse to the Marianists shortly after it occurred and that Brother Mueller may have been transferred to Colorado as a result. [Facts ¶ 38.] The Marianists knew that ACE believed the police report evidenced prior knowledge of abuse, yet refused to provide ACE with a copy of the actual police report or otherwise provide contrary information. [Facts ¶¶ 39-42.]

- According to testimony in the underlying litigation, one of the plaintiffs disclosed to a school guidance counselor in 1967 (before ACE's Policies incepted) that he had been drugged by Brother Mueller. [Facts ¶ 55.] The Marianists do not deny this report.

- The Marianists denied knowledge of any misconduct until 1983, yet: (1) according to testimony in the underlying litigation, a Marianist Brother reported to the Provincial office in 1971 that Brother Mueller was administering ether to his students; (2) according to documents provided to ACE, a Marianist Brother received reports in 1974 of "strange things" going on between Brother Mueller and his students from members of the ROTC; and (3) according to other documents provided to ACE, in 1974 a Marianist Brother had received reports that Brother Mueller was engaged in conduct with his students involving chloroforming and masturbation, and had passed these accusations along to the school principal, yet Brother Mueller remained at the school. [Facts ¶¶ 60-71.]

In other words, while considering the coverage issue at the time of settlement, ACE was aware of three discrete events reflecting that the Marianists knew, before ACE's Policies incepted, that Brother Mueller was abusing his students. The Marianists knew ACE was considering those matters in evaluating coverage and acknowledge that it was reasonable for

ACE to view this information as evidence of prior knowledge of abuse.  However, instead of offering contrary evidence or explaining those matters, the Marianists only heightened ACE's concerns by refusing to discuss them.  Layered on top of this were additional reports of post-Roncalli High School abuse of which Marianists were aware, but did nothing about, calling any denial of prior knowledge into question.

In sum, the Marianists have no evidence supporting its position that the claims against it were "unquestionably covered" as of the time of settlement and that ACE therefore engaged in bad faith conduct by not paying the full settlement amount.  Instead, there were serious coverage questions.  An insurer does not engaged in bad faith conduct by not fully funding a settlement where there are outstanding coverage issues.  [Facts ¶ 26.]  ACE's conduct at the time of settlement does not constitute bad faith under Colorado law, much less Missouri law.  ACE is entitled to summary judgment dismissal of the Marianists' bad faith claims.

F.     **The Marianists cannot show a public impact to support its Consumer Protection Act claim.**

The Marianists have asserted a Colorado Consumer Protection Act claim ("CCPA") against ACE alleging that ACE improperly forced it to contribute to the underlying settlement. [Facts ¶ 20.]  A necessary element of a CCPA claim is that the alleged deceptive act or practice significantly impacted the public as actual or potential consumers of the defendant's services. *Johnson Feed & Seed, Inc. v. Continental Western Ins. Co.,* 641 F. Supp.2d 1167, 1180 (D. Colo. 2009).  Purely private wrongs are not actionable under the CCPA.  *Id.; Brodeur v. American Home Assur. Co.,* 169 P.3d 139, 155-56 (Colo. 2007).

The Marianists have no evidence of any alleged deceptive act or practice by ACE that affects the public as a whole.  Instead, the Marianists have only a private contractual dispute with ACE.  A complete failure of proof concerning an essential element of a nonmoving party's case necessarily renders all other facts immaterial and mandates entry of summary judgment against the nonmoving party.  *Celotex,* 477 U.S. at 322-23.  Because there is no evidence of a deceptive

act or practice affecting the public as a whole, ACE is entitled to summary judgment dismissal of the Marianists' CCPA claim.

**G.**     **There is no private right of action under the UCDPA.**

Both Colorado and Missouri have versions of the Unfair Claims Settlement Practices Act. *See*, C.R.S. § 10-3-1104 (the "UCDPA") and V.A.M.S. § 375.1000 *et seq*. The Marianists have asserted a claim against ACE for alleged violation of the Colorado act. However, neither Colorado nor Missouri recognize a private cause of action for violation of their respective acts. *Showpiece Homes Corp. v. Assurance Co. of America*, 38 P.3d 47, 51 (Colo. 2002); *Stark Liquidation Co. v. Florists' Mut. Ins. Co.*, 243 S.W.3d 385, 400 (Mo. App. 2007). The Marianists' claim under the UCDPA (or its Missouri equivalent) should be dismissed.

**H.**     **The Marianists' claim under C.R.S. § 10-3-1116 must be dismissed.**

The Marianists also assert a claim for statutory bad faith under C.R.S. § 10-3-1116. [Operative Complaint at ¶¶ 23-26.] This claim fails as a matter of law. First, as discussed previously, Missouri law, not Colorado law, applies to the Marianists' extra-contractual claims. Second, C.R.S. § 10-3-1116 applies only to first-party claims, not third-party claims like those at issue in this case. *New Salida Ditch Co., Inc. v. United Fire & Cas. Ins. Co.*, 2009 WL 5126498 *5 (D. Colo. 2009) (Judge Kane).

**I.**     **ACE is entitled to summary judgment on its reimbursement cross-claim.**

If the Court grants summary judgment to ACE on the grounds that there was no occurrence, ACE is entitled to be reimbursed for the full amount of its settlement contribution and the full amount of fees and costs it incurred defending the claims. *Valley Forge Ins. Co. v. Health Care Mgmt. Ptnrs., Ltd.*, 616 F.3d 1086, 1094 (10th Cir. 2010). If the Court grants summary judgment to ACE on the basis that there was only one occurrence per policy period, ACE is entitled to summary judgment on its cross-claims for reimbursement to the extent it over-paid toward the settlement. *Id.*

## CONCLUSION

For the foregoing reasons, ACE requests that the Court enter summary judgment in its favor on all of the Marianists' claims, dismissing those claims with prejudice, and for summary judgment on its cross-claims for reimbursement.

DATED: November 22, 2010.

Respectfully submitted,
COZEN O'CONNOR

By: *s/ Christopher S. Clemenson*
  Christopher S. Clemenson
  707 – 17th Street, Suite 3100
  Denver, CO 80202
  Telephone: (720) 479-3900
  E-mail: cclemenson@cozen.com
  *Attorneys for Century Indemnity Company*

## CERTIFICATE OF SERVICE

I hereby certify that on November 22, 2010, I electronically filed the foregoing with the Clerk of Court using CM/ECF system which will send notification of such filing to the below-referenced person.

William J. Brady
Grimshaw & Harring
1700 Lincoln Street, Suite 3800
Denver CO 80203-4538
wmjbrady@grimshawharring.com

*s/ Christopher S. Clemenson*
Christopher S. Clemenson
Cozen O'Connor
707 17th St., Suite 3100
Denver, CO  80202
Phone: (720)479-3900
cclemenson@cozen.com
*Attorneys for Century Indemnity Company*