## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 08-cv-01760-WYD-MEH

THE MARIANIST PROVINCE OF THE UNITED STATES, INC., SOCIETY OF MARY, PROVINCE OF ST. LOUIS and at other times, RONCALLI HIGH SCHOOL,

      Plaintiff,

v.

CENTURY INDEMNITY COMPANY, in its own capacity and in its capacity as successor to CCI INSURANCE COMPANY, as successor to INSURANCE COMPANY OF NORTH AMERICA,

      Defendants.

---

### PLAINTIFF'S BRIEF IN SUPPORT OF ITS RESPONSE AND OBJECTION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

---

Plaintiff The Marianist Province of the United States, Inc. ("the Marianists"), by and through counsel Grimshaw & Harring, P.C., hereby files its Response Brief to Defendant Century Indemnity Company ("Defendant," "CIC" and/or "ACE")'s Motion for Summary Judgment and Brief in Support thereof as follows:

## I.  INTRODUCTION

CIC's Motion for Summary Judgment, Brief filed in support thereof, Affidavit of Chris Clemenson and Affidavit of Eileen Voegele collectively total an inordinate **54** pages, and are over **800 pages in length** including attachments.  The Movant's Statement of Material Fact in the brief alone is **17** pages, and contains **82** separate statements.

Plaintiff is troubled by Defendant's extensive recitation of Material Facts which Plaintiff does not believe is compatible with Judge Daniel's Motion Practice Instruction III, B, 2, in pertinent part, as follows:

> **However, the statement of facts sections are intended to set forth only MATERIAL facts. Excessive or prolix statement of facts sections will be STRICKEN**. (Judge's emphasis.) Additionally, the statement of facts sections are intended to comprise a comprehensive recital of all facts material to the motion. There should be no recitation of material facts outside of these sections."

However, in an effort to fully respond in good faith, Plaintiff herein addresses all of CIC's Statement of Material Facts, in accordance with the Court's directives.

Plaintiff also has not as yet received responses to discovery compelled by Magistrate Judge Hegarty's Order of October 28th, 2010 which was appealed to this Court by Defendant on November 12th, 2010, and affirmed by the Court on December 23, 2010, which Plaintiff anticipates will further assist in addressing Defendant's arguments.  Plaintiff therefore has not addressed the issues concerning the "public impact" of the Colorado Consumer Protection Act at this time, and will seek leave of Court to supplement this response at such time as responsive discovery is received from CIC.

While Plaintiff is largely in agreement with many of CIC's Statement of Material Facts, Plaintiff herewith provides responses and supplemental facts further disputing CIC's contentions. Conversely, many factual assertions have been admitted where required.  However, admissions are not to be construed as accepting of the conclusions or analyses set forth in CIC's Argument and Authority.

## II.  RESPONSE TO MOVANT'S
## STATEMENT OF UNDISPUTED MATERIAL FACTS

In its Brief in support of its Motion for Summary Judgment, CIC lists 82 numbered paragraphs of alleged undisputed facts.  For purposes of this cross motion, Plaintiff responds as follows:

A.      **The Underlying Lawsuit**

    1.      Admitted.

    2.      Admitted.

    3.      Admitted.

    4.      Admitted.

B.      **ACE's Policies**

    5.      Admitted.

    6.      Admitted.

    7.      Admitted.

    8.      Admitted.

    9.      Admitted.

    10.      Admitted.

    11.      Admitted.

    12.      DENIED.  *See* attachment to **Exhibit E**, Expert Opinion of Garth H. Allen, pp. 9-10; Clemenson Affidavit at Exhibit 2, p. 18:10-25; and attachment 1 to **Exhibit D**, Expert Opinion of Richard M. Hodges, p. 13.

C.      **Tender to ACE**

    13.      Admitted.

    14.      Admitted.

    15.      Admitted.

    16.      Admitted in part, DENIED in part.   The Marianists admit that *some* of the underlying plaintiffs alleged that Mueller had abused other students, but deny that ACE ever communicated any concern that there may be no occurrence as a result of Complaint allegations.

D.     **Settlement of Underlying Lawsuits**

    17.     Admitted.

    18.     Admitted.

    19.     Admitted.

    20.     Admitted.

    21.     Admitted.

E.     **The Marianists did not have knowledge of sexual abuse by William Mueller prior to his being placed at Roncalli High School.**

        **The "Situation at Maryhurst"**

    22.     Admitted.

    23.     Admitted.

    24.     Admitted.

    25.     DENIED.  During the pendency of the underlying proceedings, The Marianists deny that ACE ever communicated a belief that the Maryhurst letter referred to any abuse or sexual misconduct, but merely strange behavior.

    26.     Admitted.

    27.     DENIED.  The Marianists never had any knowledge of prior abuse on the part of Brother Mueller.  *See* **Exhibits A** and **B**, Affidavits of Brother Glodek and Father Solma.   In any event, the  Marianists deny that ACE communicated a belief or that any evidence supported the Marianists knew of any abuse or sexual misconduct.

    28.     Admitted in part, DENIED in part.  *See* Exhibit 5 to Clemenson Affidavit, pp. 15-24.  Coverage counsel was not aware of ACE's concern prior to settlement.

29.     Admitted in part, DENIED in part.  *See* Exhibit 5 to Clemenson Affidavit, p. 99, l. 14-25 to p. 101, l. 3.

30.     Admitted (with qualification).  The quote is properly "when I'm playing the organ, I am watching you."

31.     Admitted.

32.     Admitted.

33.     Admitted.

34.     Admitted.

35.     Admitted.

**St. John Vianney High School**

36.     Admitted.

37.     Admitted.

38.     Admitted.

39.     Admitted.

40.     Admitted.

41.     DENIED.  *See* **Exhibit C**, Affidavit of William J. Brady paragraph #10 and Exhibit 1 thereto, correspondence between David Hersh and Eileen Voegele.

42.     DENIED.  *See* **Exhibit C**, Affidavit of William J. Brady paragraph #10 and Exhibit 1 thereto, correspondence between David Hersh and Eileen Voegele.

43.     Admitted.

44.     Admitted in part, DENIED in part.  In the Suda deposition taken in the Kluempers case, Mr. Suda initially denied stating that he told Father Weisbruch that Brother Mueller had given him ether, and later stated that it was possible but he wasn't 100 percent certain, which

contradicts the police report allegation.  *See* **Exhibit H**, pp. 35-36.  Thereafter Mr. Suda stated, in his June 23, 2010 deposition in this case, that he could not recall whether or not he told Father Weisbruch that Brother Mueller used ether.  He stated, "I may not have mentioned ether exactly, but I did mention that he put me out."  *See* **Exhibit H**, p. 37-38.

45.     Admitted.

46.     Admitted.

47.     Admitted in part, DENIED in part.  In the Suda deposition taken in the Kluempers case, Mr. Suda initially denied stating that he told Father Weisbruch that Brother Mueller had given him ether, and later stated that it was possible but he wasn't 100 percent certain, which contradicts the police report allegation.  *See* **Exhibit H**, pp. 35-36.  Thereafter Mr. Suda stated, in his June 23, 2010 deposition in this case, that he could not recall whether or not he told Father Weisbruch that Brother Mueller used ether.  He stated, "I may not have mentioned ether exactly, but I did mention that he put me out."  *See* **Exhibit H**, p. 37-38.

48.     Admitted.

49.     Admitted.

50.     Admitted.

**F.     Roncalli High School**

51.     Admitted.

**"Abuse at Roncalli High School"**

52.     a.     Admitted.

         b.     Admitted.

         c.     Admitted.

         d.     Admitted.

e.      Admitted.

f.      Admitted.

g.      Admitted.

h.      Admitted.

i.      Admitted.

j.      Admitted.

k.      Admitted.

l.      Admitted.

m.      Admitted.

n.      Admitted.

o.      Admitted.

p.      Admitted.

q.      Admitted

r.      Admitted.

s.      Admitted.

t.      Admitted.

u.      Admitted.

v.      Admitted.

w.      Admitted.

**"<u>Report of Abuse to Marianists by Jack Klun</u>"**

53.     Admitted.

54.     Admitted.

55.     Admitted.

56.     Admitted.

57.     Admitted.

58.     Admitted.

59.     Admitted.

**G.     "Other Knowledge of Abuse (Relevant to Allegations of Bad Faith)"**

60.     Admitted.

61.     DENIED.  The Marianists are unaware of any documents ACE reviewed that would have indicated the Marianists had any knowledge of Br. Mueller's misconduct prior to 1983.

**"Report of Abuse by Brother Bommer"**

62.     DENIED.  The Marianists are unaware of any documents ACE reviewed that would have indicated the Marianists had any knowledge of Br. Mueller's misconduct prior to 1983.

63.     Admitted.

64.     Admitted.

65.     Admitted.

**"Report of Abuse to the Marianists by the ROTC"**

66.     Admitted.

67.     Admitted.

68.     Admitted.

**"Abuse Reported by Brother Robert Rapp"**

69.     Admitted.

70.     Admitted in part, DENIED in part.  Initially Brother Rapp did report as set forth in paragraph 70.  However, subsequent to his deposition, he spoke with Father Greg Benkowski, who refreshed his recollection about the conversation they had with students at Central Catholic High School in 1974-1975.   Thereafter, Br. Rapp, of his own volition, contacted counsel to advise that several of the statements he made in his deposition were in error.  *See* **Exhibit F** and **Exhibit G**.  He was mistaken that improper touching and/or touching of the genitals had been reported by then Brother Benkowski and the students in 1975.

71.     DENIED.  *See* **Exhibit C**, Affidavit of William J. Brady paragraph #10 and Exhibit 1 thereto, correspondence between David Hersh and Eileen Voegele.

**H.     Termination of Brother Mueller**

72.     Admitted.

73.     Admitted.

74.     Admitted.

75.     Admitted.

76.     Admitted.

77.     Admitted

78.     Admitted.

79.     Admitted.

80.     Admitted.

81.     Admitted.

82.     Admitted.

## III.   LEGAL STANDARD

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, the court may grant a summary judgment where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); see *Alvariza v. Home Depot*, 506 F.Supp.2d 451, 457 (D. Colo. 2007).   The moving party bears the initial burden of showing an absence of evidence to support the nonmoving party's case. *Alvariza*, 506 F.Supp.2d at 457.   "Once the moving party meets this burden, the burden shifts to the nonmoving party to demonstrate a genuine issue for trial on a material matter."  *Id*.

The nonmoving party must come forward with "specific facts showing that there is a genuine issue for trial." *Id.*  at 587.  Substantive law determines the materiality of facts and only "facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).

## IV.   PLAINTIFF'S STATEMENT OF ADDITIONAL DISPUTED FACTS

Note:  Due to travel abroad in remote locations in India and the unavailability of notaries, fax machines or scanning equipment, the affidavit of Father Martin Solma is not signed, and that of Brother Steven Glodek is not notarized.  Both affidavits have been reviewed and approved, and will be supplemented as received.

Plaintiff sets forth the following additional material facts:

1.      Affidavits of Brother Stephen Glodek (**Exhibit A**) and Father Martin Solma (**Exhibit B**) and supporting attachments from the depositions of Father David Fleming, Father Quentin Hakenewerth and Brother Stephen Glodek, and Response to Interrogatory No. 12 by the

Marianists, asserting that the Marianists have absolutely no record or notice of impropriety or misconduct, sexual or otherwise of Brother William Mueller until 1983.

2.      Affidavit of William J. Brady **(Exhibit C)** and supporting letters, emails, check copies, and deposition excerpts from Peter Berg and Steven Laman.

3.      Affidavit of Richard M. Hodges **(Exhibit D)** with a copy of his expert opinion dated July 30, 2010 attached thereto, as well as a copy of his rebuttal report dated August 26, 2010, evidencing correspondence, emails, depositions, CIC file documents, and other materials reviewed, and factual and legal conclusions and opinions regarding CIC's breach of contract and bad faith.

4.      Affidavit of Professor Garth H. Allen **(Exhibit E)** with a copy of his expert opinion dated July 30, 2010 attached thereto, evidencing correspondence, emails, depositions, CIC file documents, and other materials reviewed, and factual and legal conclusions and opinions regarding CIC's breach of contract and bad faith.

5.      Affidavit of Brother Robert Rapp **(Exhibit F)** and supporting pages from his deposition including a signed amendment page.

6.      Deposition excerpts from Greg Benkowski **(Exhibit G)**.

7.      Deposition excerpts from Harold Suda **(Exhibit H)**.

## V.  PLAINTIFF'S ARGUMENT AND AUTHORITY

FACTUAL BACKGROUND

CIC's approach to the defense in this case is to unduly focus on the claims in 24 lawsuits (i.e., the state court suit in Pueblo District Court against The Marianists and the Diocese of Pueblo alleging negligent retention, training and supervision resulting in the injuries and

damages to 24 Plaintiffs arising from the alleged acts of Brother Mueller) (the "Underlying Proceedings") consolidated for the purposes of settlement, rather than on the insurance contract, the parties' rights and obligations thereunder, and its own conduct. The underlying claims were eventually settled, based in part on contributions by CIC and The Marianists. At issue before this Court is whether CIC's conduct leading up to that settlement was consistent with its contractual obligations and with reasonable claims handling practices as established by applicable Colorado case law and statutes, as well as the opinions of Plaintiffs' experts in reliance upon industry standards, customs and practices. *See* **Exhibits D** and **E,** Affidavit and Reports of Plaintiff's Expert Witnesses, Richard M. Hodges and Garth H. Allen, respectively.

Here, from the inception of the Underlying Proceedings, both breach of contract and insurance bad faith standards of care were breached. CIC failed to timely reimburse The Marianists for attorneys fees, transaction and defense costs for more than a two year period after agreeing to defend, as well as failing to participate in settlement discussions and conferences in good faith during the pendency of the Underlying Proceedings as discovery unfolded. *See* **Exhibit C**, Affidavit of William Brady paragraphs 10 to 15 and attachments thereto, especially 2, pp. 183 to 190 of the deposition of Peter Burg and Steven Laman; and **Exhibits D** and **E**. CIC also required burdensome and unwarranted participation from The Marianists, permitting reasonable settlement opportunities to expire, and generally placing its own interests ahead of its policyholder by not acting in its best interests.

Even after The Marianists and the Diocese of Pueblo had offered substantial monetary contributions to the 24 Plaintiffs in the Underlying Proceedings, CIC still refused to authorize any contributions toward settlement discussions which were progressing concurrently with the Underlying Proceedings. *Id*. Not until the summer of 2008, when summary judgment motions

deadlines were imminent in the Underlying Proceedings, and the Marianists had filed the within action, did CIC finally agree to participate in settlement discussions, preconditioning any of its contribution on a matching amount from The Marianists.

<u>UNFAIR CLAIMS DECEPTIVE PRACTICES ACT and COMMON LAW BAD FAITH</u>

Colorado law has long recognized that unreasonable delay or denial of payments may serve as a basis for both breach of the insurance contract and a bad faith claim, and that the Unfair Claims Deceptive Practices Act, C.R.S. § 10-3-1104(1)(h) ("UCDPA"), serves as a basis **for industry standard of care**. *Dale v. Guaranty National Insurance Co.,* 948 P.2d 545 (1997); *Southerland v. Argonaut Insurance Co.,* 794 P.2d 1102 (Colo. App. 1990); C.R.S. §10-3-1104(1)(h)(VI) and (VII).   Contrary to CIC's assertion, The Marianists have not asserted a private cause of action under the UCDPA, but merely stated an alternative common law bad faith claim citing breach of the applicable standards  under the UCDPA.  Violations of the UCDPA, CRS Section 10-3-1104 (1) (h), are admissible to prove the unreasonableness of an insurer's conduct.  See CRS Section 10-3-1113.  *See* attachment to **Exhibit E**, Report of Professor Garth Allen at pages 5 and 10-12; **Exhibit C** Affidavit of William J. Brady, paragraphs 10 through 15, and attachments 1 through 6 referenced therein.

The industry standards embodied in a common law action for bad faith, based on violation of UCDPA standards, will be the subject of expert testimony at trial.  The fact evidence supporting the violations as detailed above will parallel the events of the Underlying Proceedings, CIC's conduct and the concurrent settlement positions espoused by CIC.  *See* **Exhibits D** and **E**.

The Colorado Supreme Court in *Dale* also cited, with approval, the following language from the *Southerland* decision, 794 P.2d at 1106:

13

> The Southerland court held that evidence of bad faith conduct which occurred *after the filing of the complaint* was admissible because this evidence was "a continuation of the same difficulties that preceded the filing of the complaint," and was relevant as evidence of a pattern of Defendant's bad faith dealings with the plaintiff. *Dale,* 948 P.2nd at 552.

*See also, Parsons v. Allstate Insurance Co.,* 165 P.3d 809, 815-817, (citing *Dale* and *Southerland* for the proposition that whether an insurer has acted reasonably is an objective one, based upon evidence of industry standards, including the unfair practices listed in C.R.S. §10-3-1104(1)(h) which could implicate conduct occurring after litigation has begun, such as not defending when the duty to defend has arisen or not attempting in good faith to effectuate a prompt, fair and equitable settlement). Evidence will also be presented of CIC's bad faith conduct after the filing of the Complaint in the within proceeding in late August 2008 and during the negotiation process involving settlement of the Underlying Proceedings. *See* **Exhibit C,** Affidavit of William J. Brady paragraph 14, and referenced attachment 6, the August 22, 2008 correspondence of Ron Kent.

STATUTORY BAD FAITH

The standard for insurance bad faith in this case, both under Colorado statutory and case law, is whether the insurance company's conduct was **unreasonable under the circumstances**. C.R.S. §10-3-1115 and 1116 (especially §10-3-1115(1)(b)(I)); *Farmer's Ins. Group. v. Trimble,* 691 P.2d 1138 (Colo. 1984). The statute broadens the prior common law definition of "first-party claimant" to include those "persons asserting an entitlement to benefits owed directly to or on behalf of an insured under an insurance policy." The same evidence on the issue of common law and statutory bad faith will also be presented on the issue of CIC's conduct in breach of contract.

The Marianists' claims under C.R.S. §§ 10-3-1115 and 1116 are appropriately pled.  With an effective date of August 5, 2008, the Colorado legislature's prior enactment of HB 08-1407

became law and was codified at C.R.S. § 10-3-1115 and § 10-3-1116.  Within the meaning of the definition of "first-party claimant" under these statutes, the Marianists reasonably believes it qualifies as a "first-party claimant" within the meaning of the statutes.  The prior case law, *Goodson v. American Std. Ins. Co.*, 89 P.3d  409, 414 (Colo. 2004), would have indicated otherwise but for the recent enactments.

C.R.S. §§ 10-3-1115 and 1116 substantially broadened the definition of "first-party claimant."  C.R.S. § 10-3-1115 provides, in pertinent part, as follows:

> (1)(b)(I)  "First-party claimant" means an individual, corporation, association, partnership, or other legal entity asserting an entitlement to benefits owed directly to or on behalf of an insured under an insurance policy. ...
> (II) "First-party claimant" does not include:
> ...
> (B) A person asserting a claim against an insured under a liability policy."
> ...
> (5)  This section *and section 10-3-1116* shall not apply to insurance issued in compliance with the "Workers' Compensation Act of Colorado", articles 40 to 46 of title 8, C.R.S.
> (6)  This section *and section 10-3-1116* shall not apply to title insurance issued pursuant to article 11 of this title or to life insurance issued pursuant to article 7 of this title.  (Emphasis added.)

As quoted above, the General Assembly expressly excludes from the scope of C.R.S. §§ 10-3-1115 and 1116 workers' compensation insurance, title insurance and life insurance, but does not similarly exclude liability insurance.  Liability policies, such as that under which the Marianists now seeks coverage, are not excluded thereunder.

Who is or is not a "first-party claimant" within the meaning of the statutes has not yet been interpreted by the state appellate courts in Colorado.  Therefore, practicing attorneys in the field of insurance bad faith in Colorado are left to reasonably interpret the above language consistent with Colorado law.  The foregoing statutory definition of "first-party claimant" is

interpreted by counsel for the Marianists to include any policyholder entities "asserting an entitlement to benefits owed directly to or on behalf of an insured under an insurance policy."  In other words, unlike the more narrow definition of "first-party claimant" in the earlier *Goodson* case, the 2008 statutes' definition broadens the term "first-party claimant."  The statutory definition now encompasses and permits bad faith claims asserted by policyholders seeking benefits under an insurance contract not so excluded, e.g. a liability insurance policy, when said benefits have been unreasonably delayed or denied.

General liability policies protect policyholders like the Marianists from claims asserted by third parties.  The insured's entitlement to the benefits contracted for with the insurer, including the defense and indemnity obligations, are benefits the insurer owes directly to its own insured policyholder under the insurance policy.  As such, an insured who seeks a defense and indemnity from its own general liability insurer is a "first-party claimant" under the plain language of C.R.S. § 10-3-1115.

Further, the foregoing list of exclusions to the definition of "first-party claimant" includes  a person asserting a claim "against an insured under a liability policy."  If the Colorado General Assembly intended to exclude from the definition of "first-party claimant" all claims against a liability policy, it could have done so.  The General Assembly did not.  Rather, the General Assembly restricted the exclusion for claims under a liability policy **to persons asserting a claim "against an insured" under a liability policy** in the underlying case against the Marianists.  Left within the definition of "first-party claimant" are insured policyholders asserting claims under liability policies, for such benefits as defense and indemnity.

The Marianists have asserted a claim for bad faith against its general liability insurer, CIC, pursuant to C.R.S. §§ 10-3-1115 and 1116, arguing that these claims arise out of the

Marianists' coverage position that CIC should have timely paid defense costs and required excessive contributions toward settlement, partially avoiding its indemnity obligation.

The Marianists' claims for defense and indemnity coverage by CIC were claims for benefits owed "directly to or on behalf of" the Marianists, and thus would be claims of a "first-party claimant," both under a plain reading of C.R.S. § 10-3-1115 and, *a fortiori*, within a reasonable interpretation of the meaning of the statute.

The Marianists' breach of contract and unreasonable/bad faith claims are based on (a) CIC's substantially delayed payment of defense costs; (b) CIC's unsubstantiated position (despite extensive discovery in the Underlying Proceedings) that The Marianists knew or should have known of Brother Mueller's bad acts; (c) CIC's conduct in forcing The Marianists to contribute to the underlying settlement despite that a defense and indemnity were owed under its insurance policy; (d) CIC's failure to separate the file for purposes of claims handling on the one hand and coverage determination on the other, and (e) CIC's unreasonable conduct during mediation in which CIC tried to "change the deal" by submitting settlement documents which contained unreasonable provisions not agreed to by the parties. In order for the trier of fact to understand and evaluate the unreasonableness of these actions, they must understand the bases for The Marianists' breach of contract claims and the untenable situation faced by The Marianists (and created in part by CIC) that caused them to contribute to the settlement.

The same evidence and testimony that will be presented in regard to The Marianists' breach of contract claim is inextricably intertwined with the evidence and testimony required to evaluate CIC's bad faith conduct in delaying its defense and indemnity obligations and forcing The Marianists to participate in settlement.

COLORADO LAW APPLIES ON THE ISSUE OF BAD FAITH

It is axiomatic that insurance bad faith conduct is governed by the law of the state where the tortious conduct takes place.  The question for the Court is simple.  Where did the tort arise?

Several witnesses will have testimony relevant to both the activities taking place in Colorado during the pendency of the Underlying Litigation, as well as the breach of contract and the unreasonable conduct/bad faith claims,  including specifically:

a.  The Marianists representatives, as both party Defendant in the Underlying Proceedings, the 24 suits filed in Colorado, and as party Plaintiff on the within breach of contract claim and bad faith conduct suit arising from CIC's actions set forth in paragraph 7 during settlement negotiations here in Colorado, and failing to participate in good faith in settlement discussions with the attorneys for the 24 Plaintiffs present for negotiations at the Judicial Arbiter Group in Denver;

b.  its defense attorneys, the law firm of Burg, Simpson, who were involved not only with the defense of the Underlying Proceedings, but who will testify to the protracted attempts to get their billings paid while continuing to defend for two years after CIC agreed to defend, the unjustifiable excuses for delay in payment of fees and settlement contributions while the Underlying Proceedings continued to progress, the impact of CIC's footdragging on settlement and increased attorneys fees and defense costs, and the lack of any evidence through the discovery process showing The Marianists had prior knowledge or should have known of Brother Mueller's alleged conduct, especially as CIC was refusing its defense obligation; and

     c.     the experts on claims handling practices and the concurrent events transpiring based not only on what The Marianists were or were not aware of, but also centering on *what CIC knew or should have known* during the pendency of the Underlying Proceedings.

It is CIC's bad faith conduct that is the issue raised by the pleadings.  It is indisputable that the allegations of tortious bad faith concern CIC's conduct in the handling of suits arising in Colorado, negotiated and adjusted in Colorado, using Colorado defense counsel, with ultimate settlement occurring in Colorado under the auspices of a Colorado mediator.  Any contractual analysis of the relationship between the parties to the insurance contract is simply irrelevant to a tort analysis.

THE HAUSER CASE

The claims alleged against the Marianists constitute an "occurrence" under the insurance policies at issue.  The insurance company's reliance on *Mountain States Mut. Cas. Co. v. Hauser*, 221 P.3d 56 (Colo. App. 2009), is misplaced because *Hauser* can be distinguished.  In *Hauser*, the assaulted party alleged and proved that the employee-perpetrator's conduct was foreseeable and not unexpected.  In fact, the trial court specifically held that the employer's conduct was willful, wanton, and reckless because the employer "knew full well what was potentially going to happen with the [plaintiff] and the female employees and did not care." *Hauser*, 221 P.3d at 57.  The *Hauser* court limited its analysis of the term "occurrence" to the policy definition that it is "an accident" but disregarded the remainder of the definition that includes "continuous or repeated exposure to substantially the same general harmful conditions." In Colorado, courts should read the provisions of an insurance policy as a whole, rather than

reading them in isolation.  *Cyprus Amax Minerals Co. v. Lexington Ins. Co.,* 74 P.3d 294, 299 (Colo. 2003).

Even the *Hauser* court acknowledges that it may be possible under different circumstances for one to conclude that an injury resulting from a foreseeable harm in a negligent hiring or supervision case may be found to be and occurrence and unexpected from the stand point of the uninsured.  *Hauser*, 221 P.3d at 61.  This case is just such a circumstance.  Brother Mueller's conduct, though not "accidental" did constitute continuous or repeated exposure to substantially the same general harmful conditions" within the meaning of the insurance policy – and as more fully developed herein, the Marianists did not have knowledge of such conduct so as to exclude the case from coverage.  Moreover, evidence of intentional conduct on the part of the Marianists has never been produced, as plaintiffs in the Underlying Proceedings settled prior to trial.

Colorado has long held that the term "occurrence" is broadly construed against an insurer.  *Colard v. American Family Mut. Ins. Co.*, 709 P.2d 11 (Colo. App. 1985).  An exclusion in a liability insurance policy violates public policy if it allows an insurer to receive a premium with no realistic chance of incurring any risk of liability, though courts should be cautious in applying this rule so as not to frustrate purposes of coverage.  *Horace Mann v. Peters*, 948 P.2d 80 (Colo. App. 1997). In order to avoid policy coverage, an insurer must establish that exemption claimed applies in particular case, and that exclusions are not subject to any other reasonable interpretation. *Compass v. City of Littleton*, 984 P.2d 606 (Colo. 1999).  Here, the complaints in the Underlying Proceedings allege *negligent hiring, retention and supervision*. While some of the unsubstantiated allegations purport to state that the Marianists were aware of

Brother Mueller's conduct, no such evidence has been forthcoming.   CIC has largely been engaged in an exercise after the fact to manufacture evidence otherwise.

Intentional injuries are excluded from liability coverage as a matter of public policy to "prevent extending to the insured a license to commit harmful, wanton or malicious acts." *American Fam. Mut. Ins. Co. v. Johnson*, 816 P.2d 952, 957 (Colo. 1991). At best, any evidence adduced to date by CIC would merely amount to negligence on the part of the Marianists under an interpretation most favorable to their coverage position.

Under one case, an injury from the insured's acts, in tape-recording a sexual encounter and playing the tape for third persons, was foreseeable as matter of law, and thus within the homeowners' policy liability coverage exclusion for occurrences resulting from insured's intentional acts where the results are *reasonably foreseeable*, even if the insured did not intend to harm his sexual partner. *Fire Ins. v. Bentley*, 953 P.2d 1297 (Colo. App. 1998).   Such is not the case here, where the results of Brother Mueller's pre-Roncalli High School conduct was never reasonably foreseeable by the Marianists.   Under Colorado law, recovery will be barred only if the insured intended the damage, or if it can be said that the damages were in a broader sense "intended" by the insured because it knew that damages would flow directly and immediately from its intentional act. *Hecla Mining*, 811 P.2d at 1088. Intent may also be inferred as a matter of law in certain cases, such as sexual assaults, where an insured's conduct is deemed to be inherently injurious. *Allstate Ins. Co. v. Troelstrup*, 789 P.2d 415, 419 (Colo. 1990); *Nikolai v. Farmers Alliance Mut. Ins. Co.*, 830 P.2d 1070 (Colo. App. 1991).   Here, however, the Marianists were engaged in conduct beneficial to the education of young men, a far cry from inherently injurious activities.

Under any view of the evidence and the cited Colorado cases, the Marianists could never be found to have intended the harm that ultimately befell the students of Brother Mueller at Roncalli High School. A separate and independent occurrence for each of the plaintiffs in the Underlying Proceedings necessarily results from the harm that each suffered at his hands, allegedly arising from the claimed negligence of the Marianists, which the Marianists vehemently deny. Much like the striking of the twin towers in New York City on September 11, 2001, each tower, separately struck by separate aircraft, constituted a separate occurrence.

## POLICY LIMITS AND THE IMPACT OF ALLOCATION OF SETTLEMENT PROCEEDS

Settlement of all of the claims in the Underlying Proceedings was reached on a global basis on August 28, 2008. Regarding the issue of policy limits, there is no basis in the law for arguing that each one of the 23 settling plaintiffs should be treated equally. Certainly, an *equitable* argument could be made that each of the settling parties should have been treated fairly. Neither Defendants nor any of the settling parties required allocation of settlement proceeds before agreeing to settle collectively for $4,000,000, instead, leaving to the Plaintiffs' counsel to allocate the proceeds.

Under the facts at hand, the Court most probably should determine that the "occurrence" is the injury-in-fact sustained by each of the settling plaintiffs as a result of the misconduct of Brother Mueller due to the allegation of negligent retention, supervision and training by the Marianists. At a minimum, CIC's exposure is $200,000 under the first year of the first policy, $1,000,000 under the second year of the first policy, $1,000,000 under the third year of the first policy, and $600,000 under the first year of the second policy.

Both Ms. Voegele and Sr. Vice President Krista Glenn attempted to leverage the Marianists into paying an equal share, having concluded that there was no justifiable basis to

deny its indemnity obligations to its insured.  *See*  attachment 1 to **Exhibit D**, pp. 13-14 of the Report of Richard M. Hodges.  CIC consciously chose to use an unjustifiable and unreasonable position to leverage settlement contribution from the Marianists.  CIC now continues its intentional and conscious disregard for the rights of the Marianists in the within litigation, denying that its policies provide coverage for the claims made in the underlying complaints. CIC's counterclaim for declaration of no coverage, and for reimbursement for what it paid, represents a willful and wanton disregard for the rights of the Marianists.  Ron Kent's threat to conduct "discovery into what the Marianists knew and when they knew it" compounds this egregious behavior.  *See* attachment 6 to **Exhibit C**, letter from Ron Kent.  Further, a successor adjuster to Eileen Voegele observed on September 22, 2009, that "none of the plaintiffs were deposed in the underlying case, so we're not sure how many, if any, will testify that they told superiors about the abuse.... . We suspect that most will say that they didn't say anything to anyone... . Our plan is to subpoena Brother Mueller and depose everyone in the chain of command that may still be alive."  *See* attachment 1 to **Exhibit D**, p. 13.  The continued bad faith course of conduct does not justify CIC limiting its damages to policy limits.

KNOWLEDGE

Finally, notice to, or knowledge of, an individual director is generally not imputed to the corporation.  *Bock v. American Growth Fund Sponsors, Inc., et al.,* 904 P.2d 1381 (Colo. Court of Appeals 1995), *citing Murphy v. Gumaer,* 12 Colo App. 472, 55 P. 951 (1899).  Notice to a majority of a quorum of directors is, of course, notice to the corporation.  *Id.*  Shareholders are not, generally, involved in the operation of a corporation; therefore notice to a shareholder is not notice to the corporation.  Notice to a controlling shareholder, however, can be imputed to the corporation.  3 W. Fletcher, *Cyclopedia of the Law of Private Corporations*, Section 814 (rev.

perm. ed. 1994).   Generally, notice coming to an officer of a corporation within the scope of his duties, is notice to the corporation.   *Id* at section 790.   **Exhibits A** and **B.**

For notice or knowledge to be attributable to the Marianists as a religious order and a not-for-profit corporation, notice would have to be given to the "control group" responsible for its operations, e.g. the Provincial and/or members of the Provincial Council.   The mere relating of an anecdote to one of the members or employees of a not-for-profit corporation does not constitute notice or knowledge to the control group.   Assuming arguendo, that the Court believes some evidence exists which may have alerted the Marianists to Brother Mueller's potential misconduct prior to being assigned to Roncalli High School in 1966, at a minimum it is a question of material fact for the jury to decide as to whether the Marianists ever had sufficient knowledge which would have alerted them to Brother Mueller's potential for engaging in sexual improprieties with students.

## VI.   CONCLUSION

Plaintiff purposely has left additional pages for argument on issues related to the Colorado Consumer Protection Act after Defendant supplies responses to outstanding discovery requests and the Court's order of December 23, 2010.

Based on the significant issues of material fact to be determined by the jury, as set forth herein, this case must proceed to trial.   Although the Marianists believe that there is no material evidence of any knowledge of Brother Mueller's potential sexual proclivities prior to 1983, the Court may be disposed otherwise.   Similarly, the Marianists believe that CIC's conduct in adjusting and settling the claims against the Marianists constitutes prima facie insurance bad faith.   Assuming arguendo that the Court believes that there are material facts in dispute which

require critical findings to be made before entry of judgment, the Court must deny CICs Motion

for Summary Judgment, deny their counter claim, and order that this case proceed to a trial.

DATED this 14th day of January, 2011.

GRIMSHAW & HARRING, P.C.

*s/ William J. Brady*
William J. Brady, Esq.
1700 Lincoln St., Suite 3800
Denver, CO 80203
Phone: 303-839-3800;  Fax: 303-839-38383
wmjbrady@grimshawharring.com
*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I certify that on this 14th day of January, 2011, a true and correct copy of the foregoing
PLAINTIFF'S RESPONSE BRIEF was served electronically on the following:

Christopher S. Clemenson, Esq.          cclemenson@cozen.com
Mark A. Bartholomaei, Esq.              mbartholomaei@cozen.com
Cozen O'Connor
707 - 17th Street, Suite 3100
Denver, Colorado, 80202

s/ William J. Brady
William J. Brady