## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 08-cv-01760-WYD-MEH

THE MARIANIST PROVINCE OF THE UNITED STATES, INC., SOCIETY OF MARY, PROVINCE OF ST. LOUIS and at other times, RONCALLI HIGH SCHOOL,

      Plaintiff,

v.

CENTURY INDEMNITY COMPANY, in its own capacity and in its capacity as successor to CCI INSURANCE COMPANY, as successor to INSURANCE COMPANY OF NORTH AMERICA,

      Defendants.

---

## REPLY TO PLAINTIFF'S RESPONSE AND OBJECTION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND BRIEF IN SUPPORT THEREOF

---

      COMES NOW the Defendant, Century Indemnity Company (hereinafter, "ACE"), by and through its undersigned counsel, and submits the following reply to the briefing filed by the Plaintiff (the "Marianists") in response to ACE's motion for summary judgment.[1]   For consistency, the same abbreviations are used in this reply as were used in the *Brief in Support of Motion for Summary Judgment* ("Opening Brief").

### INTRODUCTION

      ACE is entitled to summary judgment because the Marianists have not raised a genuine issue of material fact with respect to any matter in ACE's Opening Brief, and the law applied to the facts entitles ACE to judgment as a matter of law.  More specifically, ACE's policies do not

---

[1] The Marianists' substantive responsive pleadings consist of: (1) *Plaintiff's Brief in Support of Its Response and Objection to Defendant's Motion for Summary Judgment* [Docket #165-1] ("Response Brief"); (2) *Supplement to Plaintiff's Brief in Support of Its Response and Objection to Defendant's Motion for Summary Judgment* [Docket #168] ("First Supplement Response"); and (3) *Plaintiff's Supplement to Response and Objection to Defendant's Motion for Summary Judgment* [Docket #172] ("Second Supplemental Response").

provide coverage for the underlying lawsuits because there was no "occurrence." Even if there was an "occurrence," ACE owes no additional coverage because the undisputed facts show that there would be but a single occurrence per policy year, meaning that ACE has already paid more than was required by its policies. The relief sought by ACE is fully set forth in its Opening Brief.

## REPLY CONCERNING UNDISPUTED FACTS

The Marianists complain that the facts in ACE's Opening Brief were too long, yet identify none of the facts as irrelevant. The facts were not excessive given that there were 24 underlying lawsuits with events spanning decades that had to be discussed and supported with citations to the record.

The Marianists denied or partially denied only 15 of ACE's 104 Material Facts. As demonstrated below, the Marianists' denials and partial denials are without merit. For ease of reference, ACE has included the original statement of fact and the Marianists' denial.

## Material Fact ¶ 12

> 12.    Garth Allen, the Marianists' expert, agreed that the applicable limits for this case would be capped at the per occurrence limit per policy year." [Clemenson Affidavit at Ex. 2, pg. 18:1 – 10.]

> Marianist Response:  DENIED. See attachment to Exhibit E, Expert Opinion of Garth H. Allen, pp. 9-10; Clemenson Affidavit at Exhibit 2, p. 18:10-25; and attachment 1 to Exhibit D, Expert Opinion of Richard M. Hodges, p. 13.

There is no genuine dispute as to Material Fact ¶ 12. Neither of the Marianists' expert reports at the cited pages (or elsewhere) discuss how the limits apply to this case. Similarly, nothing in the portions of Professor Allen's deposition cited by the Marianists contradicts his testimony concerning the available limits. His testimony was that the total policy limit available over a six-year span was $1.8 million, which is $300,000 per year. [Clemenson Affidavit at Ex.

2, pg. 18.][2] This is the amount of ACE's yearly per occurrence limit. [Material Fact ¶ 11.] Also, as discussed in the argument section, neither Professor Allen's nor Mr. Hodges' expert reports are admissible as evidence to oppose summary judgment.

## Material Fact ¶ 16

> 16.    ACE was concerned that there may be no "occurrence" under its Policies because the underlying plaintiffs alleged the Marianists were aware, prior to the time of their own abuse, that that Brother Mueller had abused other students. [*See generally*, Voegele Affidavit at Exs. 3.a.-f. and 4.a.-e.]

> Marianist Response:  Admitted in part, DENIED in part. The Marianists admit that some of the underlying plaintiffs alleged that Mueller had abused other students, but deny that ACE ever communicated any concern that there may be no occurrence as a result of Complaint allegations.

There is no genuine dispute as to Material Fact ¶ 16.  Each of the 24 underlying complaints alleged that the Marianists were aware that Brother Mueller had sexually abused other students prior to the time when that particular plaintiff was abused, asserting:

> At the time he was sexually abused, [Plaintiff] was unaware that Defendants knew that BROTHER MUELLER sexually abused other students.

[Voegele Affidavit at Exs. 3.a.-f.]

The remainder of the denial is an unsupported assertion that ACE did not communicate its concerns to the Marianists, which is beyond what was stated in Material Fact ¶ 16.[3]

## Material Fact ¶ 25

> 25.    ACE believed the Situation at Maryhurst Letter may have referred to abuse by Brother Mueller about which the Marianists had knowledge before the inception of ACE's Policies. [Voegele Affidavit at ¶ 10.]

---

[2] ACE notes that the facts of this case support only four, not six, policy years being exposed.  [Opening Brief at pg. 27 (allocating settlements across 4 policy periods based on date of injury).]  The Marianists agree.  [Response Brief at pg. 22 (allocating settlements across 4 policy periods).]

[3] The unsupported assertion is also wrong.  ACE expressed its concern by reserving its rights as to whether there had been an "occurrence" – a fact admitted by the Marianists. [Material Fact ¶ 15.]

> Marianist Response: DENIED. During the pendency of the underlying proceedings, The Marianists deny that ACE ever communicated a belief that the Maryhurst letter referred to any abuse or sexual misconduct, but merely strange behavior.

There is no genuine dispute as to Material Fact ¶ 25. The Marianists' response does not address Material Fact ¶ 25, which set forth ACE's concerns about the Situation at Maryhurst Letter. Rather, the Marianists' response is an unsupported assertion that ACE did not share its concerns with the Marianists, which is beyond what was stated in Material Fact ¶ 25.[4]

**Material Fact ¶ 27**

> 27.    The Marianists knew that its knowledge of prior abuse by Brother Mueller was relevant to not only its defense of the case, but was also relevant to the question of insurance coverage. [Clemenson Affidavit at Ex. 1, pgs. 87:11 – 88:6.].

> Marianist Response: DENIED. The Marianists never had any knowledge of prior abuse on the part of Brother Mueller. See Exhibits A and B, Affidavits of Brother Glodek and Father Solma. In any event, the Marianists deny that ACE communicated a belief or that any evidence supported the Marianists knew of any abuse or sexual misconduct.

There is no genuine dispute as to Material Fact ¶ 27. The Marianists' response does not address what was stated in Material Fact ¶ 27, which is that the Marianists were aware that any knowledge of prior abuse was relevant to its defense and also relevant to coverage. This was admitted by the Marianists' Rule 30(b)(6) designee, Brother Glodek. [Clemenson Affidavit at Ex. 1, pgs. 87:11 – 88:6.] The response also makes unsupported assertions that ACE did not communicate certain beliefs to the Marianists, which is beyond what was stated in Material Fact ¶ 27.[5]

---

[4] The unsupported assertion is also wrong. ACE expressed its concerns to the Marianists through the Marianists' counsel, Burg Simpson. Peter of Burg Simpson testified ACE told him that ACE thought the Marianists had knowledge of Brother Mueller's abusive propensities, and that ACE specifically made reference to "Olszewski." [Clemenson Affidavit at Ex. 5, pgs. 112:7-14.] Mr. Olszewski is the individual who is the subject of the Situation at Maryhurst Letter.

[5] The unsupported assertions are also wrong. As discussed above with respect to Material Fact ¶ 25 and below with respect to Material Fact ¶ 28, ACE communicated its concerns to the Marianists. Also, Brother Glodek and Fr. Solma have no personal knowledge of what was or was not known to the

**Material Fact ¶ 28**

28.    The Marianists' counsel was aware of ACE's concerns about the Situation at Maryhurst Letter.  [Voegele Affidavit at ¶ 10; Clemenson Affidavit at Ex. 5, pgs. 112:7-14.]

Marianist Response:  Admitted in part, DENIED in part. See Exhibit 5 to Clemenson Affidavit, pp. 15-24. Coverage counsel was not aware of ACE's concern prior to settlement.

There is no genuine dispute as to Material Fact ¶ 28.  ACE notes that there are no pages 15-24 to Exhibit 5 of the Clemenson Affidavit, but presumes the Marianists are referring to lines 15-24 on page 112.  Those lines do not refute that Burg Simpson, the Marianists' counsel, was on notice of ACE's concerns.  Burg Simpson was not appointed defense counsel.  Rather, Burg Simpson represented the Marianists before ACE became involved.  [*Second Affidavit of Christopher S. Clemenson in Support of Summary Judgment* ("Second Clemenson Affidavit") at Ex. 12, pgs. 47:5 – 49:3.]  In fact, Burg Simpson's argued coverage issues with ACE on the Marianists' behalf.  [Second Clemenson Affidavit at Ex. 12, pgs. 28:8 – 29:1; Brady Affidavit at Ex. 1.]  The statement that "coverage" counsel was not aware of ACE's concerns presumably refers to their present counsel, Mr. Brady.  Whether or not Mr. Brady also knew is irrelevant; Burg Simpson knew.

**Material Fact ¶ 29**

29.    Although aware of ACE's concerns, neither the Marianists nor its counsel offered ACE any contrary explanation of the Situation at Maryhurst Letter during the course of the underlying litigation.  [Voegele Affidavit at ¶ 10; Clemenson Affidavit at Ex. 1, pgs. 58:12 – 59:19 and 63:1 – 64:7; Clemenson Affidavit at Ex. 5, pgs. 99:22 – 104:4 and 111:6 – 114:15.]

Marianist Response:  Admitted in part, DENIED in part. See Exhibit 5 to Clemenson Affidavit, p. 99, l. 14-25 to p. 101, l. 3.

---

Marianists in the 1950s, 1960s and 1970s.  The evidence shows the Marianists had knowledge of prior abuse.  [*See, e.g.*, Material Facts ¶¶ 22-50 and 53-59.]

There is no genuine dispute as to Material Fact ¶ 29.  The facts cited in the Marianists' Response Brief do not show that the Marianists offered any explanation of the Situation at Maryhurst Letter.

### Material Fact ¶ 30

> 30.    After the underlying cases settled, Mr. Olszewski, the student referred to in the Situation at Maryhurst letter, was deposed in this case and testified that during his sophomore year in high school (1957-58), Brother Mueller would leave notes in Mr. Olszewski's hymnal stating things to the effect of: "I think you are cute," "I am watching you," and "We should get together." [Clemenson Affidavit at Ex. 6, pgs. 8:8-15 and 11:7-24.]
>
> Marianist Response:  Admitted (with qualification). The quote is properly "when I'm playing the organ, I am watching you."

Admitted, but it does not change the substance of Material Fact ¶ 30.

### Material Fact ¶ 41

> 41.    Neither the Marianists nor its counsel provided the police report to ACE nor did it indicate to ACE that the allegations in the police report were not true. [Voegele Affidavit at ¶ 12; Clemenson Affidavit at Ex. 1, pgs. 91:5 – 92:6 and 94:9-18.]
>
> Marianist Response:  DENIED. See Exhibit C, Affidavit of William J. Brady paragraph #10 and Exhibit 1 thereto, correspondence between David Hersh and Eileen Voegele.

There is no genuine dispute as to Material Fact ¶ 41.  The facts cited in the Marianists' Response Brief do not show that the police report was given to ACE or that the event described in the report were denied.

### Material Fact ¶ 42

> 42.    The Marianists' counsel testified they did not provide the police report (or other information) to ACE because they did not wish to aid ACE in its consideration of the coverage issues. [Clemenson Affidavit at Ex. 5, pgs. 102:2-24 and 118:4 – 119:14.]

> Marianist Response:   DENIED. See Exhibit C, Affidavit of William J.
> Brady paragraph #10 and Exhibit 1 thereto, correspondence between
> David Hersh and Eileen Voegele.

There is no genuine dispute as to Material Fact ¶ 42.  The facts cited in the Marianists'

Response Brief do not contradict Peter Burg's testimony.

## Material Fact ¶ 44

> 44.   Mr. Suda met Brother Mueller after school in the band room and
> was asked by Brother Mueller to lay down on a table, whereupon Brother
> Mueller then administered ether to Mr. Suda, rendering him unconscious
> for 10-15 minutes. [Clemenson Affidavit at Ex. 7, pgs. 14:11 – 15:19.]

> Marianist Response:   Admitted in part, DENIED in part. In the Suda
> deposition taken in the Kluempers case, Mr. Suda initially denied stating
> that he told Father Weisbruch that Brother Mueller had given him ether,
> and later stated that it was possible but he wasn't 100 percent certain,
> which contradicts the police report allegation. See Exhibit H, pp. 35-36.
> Thereafter Mr. Suda stated, in his June 23, 2010 deposition in this case,
> that he could not recall whether or not he told Father Weisbruch that
> Brother Mueller used ether. He stated, "I may not have mentioned ether
> exactly, but I did mention that he put me out." See Exhibit H, p. 37-38.

There is no genuine dispute as to Material Fact ¶ 44.  The facts cited in the Marianists'

Response Brief refer to what Mr. Suda did or did not tell Father Weisbruch.  Material Fact ¶ 44

refers to what actually happened, not what Mr. Suda told Father Weisbruch.

## Material Fact ¶ 47

> 47.   Mr. Suda subsequently spoke with the principal at Vianney and
> disclosed to him that Brother Mueller had knocked him out with ether as
> part of an "experiment" to obtain an advanced degree.   [Clemenson
> Affidavit at Ex. 7, pgs. 21:3 – 22:12.]

> Marianist Response:   Admitted in part, DENIED in part. In the Suda
> deposition taken in the Kluempers case, Mr. Suda initially denied stating
> that he told Father Weisbruch that Brother Mueller had given him ether,
> and later stated that it was possible but he wasn't 100 percent certain,
> which contradicts the police report allegation. See Exhibit H, pp. 35-36.
> Thereafter Mr. Suda stated, in his June 23, 2010 deposition in this case,
> that he could not recall whether or not he told Father Weisbruch that

Brother Mueller used ether. He stated, "I may not have mentioned ether exactly, but I did mention that he put me out." See Exhibit H, p. 37-38.

There is no genuine dispute as to Material Fact ¶ 47, but ACE acknowledges that Mr. Suda testified that while he *may* not have used the word "ether," he did tell Father Weisbruch that he had been put out with something. Thus, the substance of Material Fact ¶ 47 has not changed. ACE notes that there is no Exhibit H to the Marianists' Response Brief.

## Material Fact ¶ 61

61.     However, while considering the liability and coverage issues during the underlying litigation, ACE reviewed documents provided by the Marianists that indicated the Marianists may have had knowledge of misconduct by Brother Mueller long before 1983. [Voegele Affidavit at ¶ 9 and Exs. 5.a – 5.f.]

Marianist Response:   DENIED. The Marianists are unaware of any documents ACE reviewed that would have indicated the Marianists had any knowledge of Br. Mueller's misconduct prior to 1983.

There is no genuine dispute as to Material Fact ¶ 61. The Marianists' response is argumentative rather than fact based and cites no evidence in support of the denial. In any event, this paragraph is primarily transitional, and the actual documents provided by the Marianists are discussed in subsequent paragraphs.

## Material Fact ¶ 62

62.     One such document was a Marianist memorandum regarding an interview conducted with Brother Jerry Bommer, the former Director of Religious Community at Roncalli High School. [Voegele Affidavit at ¶ 9 and Ex. 5.b.]

Marianist Response:   DENIED. The Marianists are unaware of any documents ACE reviewed that would have indicated the Marianists had any knowledge of Br. Mueller's misconduct prior to 1983.

There is no genuine dispute as to Material Fact ¶ 62. The Marianists' response is argumentative rather than fact based and cites no evidence in support of the denial. There is no

dispute that there is a Marianist memorandum regarding an interview with Brother Bommer as evidenced by the Marianists' admission of Material Facts ¶¶ 63-64.

**Material Fact ¶ 70**

70.     According to the interview summary, Brother Rapp reported in 1974-75 that students were accusing Brother Mueller of doing "weird things" involving chloroforming and masturbation:

In the 1974-75 school year, Bob Rapp was a teacher at CCHS. Greg Benkowski was a Marianist brother also teaching at CCHS. Greg told Bob that his freshman & sophomores were telling him about weird things Bill Mueller was doing (including chloroforming and masturbation). Mueller told the kids he was doing the experiments for the SM order.

Greg asked Bob Rapp to go with him to talk to the late Brother Robert Godfrey, who was then principal of CCHS. They told Brother Godfrey everything. Bro. Godfrey told them that Fr. Quentin Hackenwerth (provincial) would be coming in to handle it. Several days later, Fr. Quentin came to San Antonio & spoke with Godfrey. William Mueller remained at CCHS.

In 1981-82, Bob Rapp was director in E. St. Louis. Bob said he was "pissed off" that Bill Mueller was appointed principal of St. Mary's after what he had done at CCHS. ... he said it was like sending "a fox into the chicken coop." Bob said words to this effect to Dan Sharpe, but received only a shrug. At the time, Dave Fleming was provincial & Dan Sharpe was asst provincial.

[Voegele Affidavit at Ex. 5.f. (ellipses in original)]

Marianist Response: Admitted in part, DENIED in part. Initially Brother Rapp did report as set forth in paragraph 70. However, subsequent to his deposition, he spoke with Father Greg Benkowski, who refreshed his recollection about the conversation they had with students at Central Catholic High School in 1974-1975. Thereafter, Br. Rapp, of his own volition, contacted counsel to advise that several of the statements he made in his deposition were in error. See Exhibit F and Exhibit G. He was mistaken that improper touching and/or touching of the genitals had been reported by then Brother Benkowski and the students in 1975.

There is no genuine dispute as to Material Fact ¶ 70.   Material Fact ¶ 70 refers to an interview summary written by Brother Glodek, not a deposition taken in this case. This is crucial

because this fact is offered to establish ACE's knowledge at the time of settlement (for purposes of judging its conduct), not what ACE may have learned in this case when Brother Rapp materially changed his deposition testimony.[6]

**Material Fact ¶ 71**

> 71.    Neither the Marianists nor their counsel provided ACE with any information calling into question Brother Rapp's report.   [Voegele Affidavit at ¶ 14.]

> Marianist Response:  DENIED. See Exhibit C, Affidavit of William J. Brady paragraph #10 and Exhibit 1 thereto, correspondence between David Hersh and Eileen Voegele.

There is no genuine dispute as to Material Fact ¶ 71.  The facts cited in the Marianists' Response Brief do not call any portion of Material Fact ¶ 71 into question.

## RESPONSE CONCERNING DISPUTED FACTS

The Marianists have not set forth individual facts for ACE to address, making it difficult for ACE to respond as required by this Court's Practice Standards.  Nevertheless, ACE responds as follows:

1.a.    Affidavit of Brother Stephen Glodek

¶¶ 1-2  ACE does not contest the matters set forth in paragraphs 1 or 2.

¶ 3     ACE denies the statements in paragraph 3 (*i.e.*, that the Marianists had no record or notice of impropriety or misconduct by Brother Mueller until 1983) for the reasons set forth in Material Facts ¶¶ 22-50, 53-71 and 76-78 of the Opening Brief.  In addition, Brother Glodek has no personal knowledge of what the Marianists did or did not know in the 1950s, 1960s or 1970s.

¶ 4     ACE does not contest the matters set forth in paragraph 4, except for the last phrase "supporting the assertions of paragraph 3," which ACE denies for the reasons it denies the

---

[6] There are serious issues with a witness changing testimony long after the testimony was given.  This is not an issue central to summary judgment and will be addressed at trial should the need arise.

statements in paragraph 3. ACE does not contest the accuracy of the deposition transcripts attached as exhibits.

¶ 5 ACE does not contest the matters set forth in paragraphs 5-10.

1.b. Affidavit of Father Martin Solma

¶¶ 1-2 ACE does not contest the matters set forth in paragraphs 1 or 2.

¶ 3 ACE denies the statements in paragraph 3 (*i.e.*, that the Marianists had no record or notice of impropriety or misconduct by Brother Mueller until 1983) for the reasons set forth in Material Facts ¶¶ 22-50, 53-71 and 76-78 of the Opening Brief. In addition, Fr. Solma has no personal knowledge of what the Marianists did or did not know in the 1950s, 1960s or 1970s.

¶ 4 ACE does not contest the matters set forth in paragraph 4, except for the last phrase "supporting the assertions of paragraph 3," which ACE denies for the reasons it denies the statements in paragraph 3. ACE does not contest the accuracy of the deposition transcripts attached as exhibits.

¶¶ 5-10 ACE does not contest the matters set forth in paragraphs 5-10.

2. Affidavit of William J. Brady

¶¶ 1-4 ACE does not contest the matters set forth in paragraphs 1-4.

¶ 5 ACE does not contest the matters set forth in paragraph 5, except that ACE denies ACE USA is a predecessor of CIC. "ACE USA" is a non-entity marketing identifier that refers to ACE Limited's United States and Canadian business operations. As stated in CIC's *Corporate Disclosure Statement* (Docket #65), CIC is an indirect subsidiary of ACE Limited.

¶ 6 ACE denies paragraph 6 as an overly broad statement of what the policies cover (a legal issue), and expressly denies that the underlying lawsuits were covered. The relevant policies speak for themselves and are attached as Exs. 1-2 to the Voegele Affidavit.

¶¶ 7-8 ACE does not contest the matters set forth in paragraphs 7-8.

¶ 9    ACE does not contest the matters set forth in paragraph 9, except to state that there was also a February 27, 2008, e-mail pertaining to reservation of rights with respect to two underlying plaintiffs and a February 27, 2008, denial letter pertaining to one underlying plaintiff. [Voegele Affidavit at ¶ 4 and Exs. 4.d.-e.]

¶ 10    With respect to paragraph 10, ACE does not deny the genuineness of the attached letters but states that the letters speak for themselves and are not accurately paraphrased in paragraph 10.   ACE expressly does not agree with the applicability or correctness of the law cited in Burg Simpson's May 18, 2007, letter.

¶ 11    ACE admits the first sentence of paragraph 11 but denies the remainder of the paragraph.    There is no evidence that ACE "stymied" the settlement process or failed to participate.   In fact, the Marianists' expert testified that it would be speculation for him to opine that the underlying cases would have ended any differently than they did.

> Q    (By Mr. Clemenson)   Are you prepared to offer the opinion that had Century Indemnity, as you believe they should have, stepped in and taken over the negotiations of the case at an earlier point in time, that this case would have ended any differently?
>
> A    I have no idea.
>
> Q    Okay.
>
> A    Pure speculation. ...

[Second Clemenson Affidavit at Ex. 14, pg. 158:10-18]

The statements attributed to Ms. Voegele are also incomplete.   She did not make a blanket statement that ACE always requires its insured religious institutions to contribute to settlements.   Rather, she told the Marianists they needed to participate because ACE had "good, legitimate coverage issues."   [Brady Affidavit at Ex. 2, pgs 189:15 – 190:4.  *See also*, *Deposition of Eileen Voegele* (Sealed at Docket 150), pg. 19:7-24.][7]

---

[7] ACE has growing concerns that Mr. Brady is interjecting himself as a key witness to this case. *See*, Marianists' denial of Material Fact ¶ 28 and Brady Affidavit ¶¶ 11 and 13.   If Mr. Brady intends on testifying at trial, ACE should be given the opportunity to depose him.

¶ 12    ACE does not contest the matters set forth in paragraph 12.

¶ 13    ACE admits that Exhibit 5 is a May 23, 2008, e-mail but denies that it reflects the parties' and mediator's view that the settlement process was being stymied by ACE. The e-mail is a self-serving statement from the Marianists' coverage counsel, not the mediator or the Bishop's counsel, and reflects only Mr. Brady's biased view.

¶ 14    ACE admits that Exhibit 6 is an August 22, 2008, letter from ACE's coverage counsel to the Marianists' coverage counsel, which letter speaks for itself. ACE notes that this letter places the Marianists' coverage counsel on notice that ACE is concerned about what occurred at Maryhurst, and thus, the Situation at Maryhurst Letter, contrary to Marianists' denial of Material Fact ¶ 28.

¶ 15    ACE admits that it has conducted deposition discovery, but denies that discovery was "extensive" or caused any undue burden to the Marianists. ACE did not exceed the discovery limitations set forth in the *Scheduling Order* (Docket #74), which would have permitted up to 30 depositions. Instead, ACE has conducted approximately 20 depositions (not the "dozens" of depositions represented by Mr. Brady). Two were depositions of the Marianists' experts. Six were non-party fact witnesses, including prior abuse victims, potential victims and a Diocesan priest to whom abuse was reported. Twelve depositions were of Marianists, former Marianists or the Marianists' counsel.[8] While many of the depositions were not local, ACE willingly conducted depositions via videoconferencing or telephone, including a witness in Rhode Island, a witness in London, England and a witness in Bangalore, India. Mr. Brady chose to attend the London deposition in person. The witness who is based in Hawaii was actually deposed in Wisconsin while home visiting his family, although ACE had offered to do it by

---

[8] The Marianists designated 3 persons who would respond to different topics as Rule 30(b)(6) witnesses and Burg Simpson designated 2 persons, but those are each technically a single corporate deposition.

videoconference.  ACE has no control over the location of witnesses for the Marianists, which is admittedly a national and international religious organization.

¶ 16     Denied for the reasons set forth in Material Facts ¶¶ 22-50, 53-71 and 76-78 of the Opening Brief.  Mr. Brady also has no personal knowledge of what the Marianists did not did not know.

3.     <u>Affidavit of Richard M. Hodges</u>

¶¶ 1-8 ACE does not contest the facts set forth in paragraphs 1-8 of Mr. Hodges Affidavit.  However, ACE has numerous disputes with the facts set forth in Mr. Hodges' reports, not to mention the legal conclusions he draws therefrom.  ACE cannot respond to all of those issues in any reasonable fashion.  Regardless, for the reasons discussed in the argument section, Mr. Hodges' reports are inadmissible and cannot be considered for purposes of summary judgment.

4.     <u>Affidavit of Professor Garth H. Allen</u>

¶¶ 1-9 ACE does not contest the facts set forth in paragraphs 1-9 of Professor Allen's Affidavit.  However, ACE has numerous disputes with the facts set forth in Professor Allen's report, not to mention the legal conclusions he draws therefrom.  ACE cannot respond to all of those issues in any reasonable fashion.  Regardless, for the reasons discussed in the argument section, Mr. Allen's report is inadmissible and cannot be considered for purposes of summary judgment.

5.     <u>Affidavit of Brother Robert Rapp</u>

¶ 1     ACE does not contest the matters set forth in paragraph 1.

¶¶ 2-7 Brother Rapp is dramatically changing his sworn testimony.  He testified that students told him Brother Mueller was touching their genitals.  [Second Clemenson Affidavit at Ex. 13, pgs. 18:20 – 20:7.]  He testified that he told this to the Marianist school principal. [Second Clemenson Affidavit at Ex. 13, pgs. 21:5 – 22:10.]  Now he says such vivid memories

of egregious events are not accurate. ACE denies this attempt to backtrack from damning testimony.

¶ 8    ACE admits that Brother Rapp told Brothers Godfrey, Ringkamp and Jaeckle that students reported being chloroformed by Brother Mueller, but denies that Brother Rapp did not also inform them that the students also reported that Brother Mueller touched their genitals. [Second Clemenson Affidavit at Ex. 13, pgs. 23:8 – 24:21.]

¶ 9    ACE does not contest the matters set forth in paragraph 9.

6.    Excerpts from the deposition of Greg Benkowski

ACE acknowledges that the excerpts are true and correct copies of Fr. Benkowski's deposition.

7.    Excerpts from the deposition of Harold Suda

There are no excerpts from Mr. Suda's deposition attached as Exhibit H. ACE notes that the Marianists have referred to portions of what appears to be Mr. Suda's deposition in response to Material Facts ¶¶ 44 and 47; specifically pages 35-38. Those pages, if being offered, speak for themselves, and ACE does not deny the accuracy of the transcription.

**ARGUMENT AND AUTHORITY**

**A.    ACE is entitled to dismissal of the Marianists' claims related to five underlying plaintiffs and the Marianists' UCDPA claim.**

In its Opening Brief, ACE set forth what are now admitted facts showing that five of the underlying plaintiffs were abused (and thus sustained "personal injury") before ACE's Policies incepted. [Material Facts ¶¶ 3 and 52.a.-e.] The undisputed facts also establish that ACE's Policies only cover "occurrences" happening during their policy periods. [Material Fact ¶ 8.] ACE identified the controlling case law establishing that the time of an "occurrence" is the time when the complaining party is injured. [Opening Brief at pg. 28.] The Marianists have offered no argument as to why ACE would owe coverage for the claims of the five individuals injured

before ACE's Policies incepted.  ACE is therefore entitled to summary judgment dismissal of the Marianists claims for defense costs and settlement payments with respect to those five underlying plaintiffs.

The Marianists also admit they are not asserting a UCDPA claim [Response Brief at pg. 13], so that cause of action in their complaint should be dismissed.

**B.      The expert reports of Professor Allen and Mr. Hodges are inadmissible.**

The Marianists offer the expert reports of Professor Allen and Mr. Hodges as evidence the Court should consider on summary judgment.  The expert reports, used to attempt to show the existence of an operative fact, are inadmissible hearsay to which no exception applies.  Fed. R. Evid. 801(c) and 802; *Fisher v. City of Las Cruces*, 584 F.3d 888, 897 n. 3 (10th Cir.2009) (observing that hearsay is "inadmissible in a summary judgment proceeding").  The Court should not consider those reports on summary judgment.

**C.      Under the undisputed facts of this case, there was no "occurrence."**

The Marianists assert that the issue before the Court is whether ACE's conduct leading up to settlement was consistent with its contractual, common law and statutory obligations. [Response Brief at pg. 12.]  This is an incomplete statement of the issues.  The first, and more critical issue, is whether coverage exists for the underlying claims.  Under the undisputed facts, there is no coverage because there was no "occurrence."  This renders ACE's alleged conduct irrelevant.  *Farmers Alliance Mut. Ins. Co. v. Cutrone*, 448 F. Supp.2d 1226, 1234 (Colo. 2006) (without coverage there can be no bad faith).

The Marianists admitted that the term "occurrence" was defined as set forth in Material Fact ¶ 10, which is, for purposes of personal injury, "an accident happening during the coverage period." [Response at pg. 3.]  However, in their Second Supplemental Response, the Marianists argue for the application of a different definition.  [Second Supplemental Response at pg. 3 of attachment.]  The problem is that the definition cited by the Marianists in the Second

Supplemental Response was deleted from ACE's Policies by the INA Package Policy – AGP endorsement to the Policies.  This endorsement states, in pertinent part:

**Section II**

\* \* \*

B.     The following provisions are deleted:

Under Part A – COVERAGE, paragraph 3 Insurance for Newly Acquired Premises And Other Hazards;

Under Part B – DEFINITIONS, paragraph 2 Premises and paragraph 5 Occurrence;

\* \* \*

[Voegele Affidavit at Ex. 1 at INA-0013 and Ex. 2 at INA-0064 (emphasis added).]

The only definition in the Policies for the term "occurrence" is the definition ACE cited in Material Fact ¶ 10.  This definition includes not only a definition of "occurrence" for purposes of "property damage," but also for when there is "personal injury."  Thus, for purpose of the "personal injury" at issue, an "occurrence" is an "accident happening during the coverage period."

Regardless, whether "occurrence" is defined as an "accident" or an "accident including continuous or repeated exposure to conditions which unexpectedly or unintentionally causes personal injury" as the Marianists may contend, there is no "occurrence" in this case.  In arguing that there was an "occurrence," the Marianists ignore the actual holding of *Mountain States Cas. Co. v. Hauser*, 221 P.3d 56 (Colo. App. 2009), focusing instead on dicta stating that in *some* circumstances, negligent supervision *may* constitute an "occurrence."  Whether this dicta is correct or not is of no consequence because *Hauser* held that there is no "occurrence" for negligently supervising a sex abuser – the exact situation present here.  *Hauser*, 221 P.3d at 60-61.

But even if the Marianists' failure to supervision Brother Mueller could theoretically constitute an "occurrence," the undisputed facts establish that there was no "occurrence."  Case

law from Colorado and other jurisdictions establishes that there can be no "occurrence" when an employer has actual knowledge of a subordinate's abusive propensities. *Hauser*, 221 P.3d at 61 (once insured knew of employee's abusive propensities there could be no "occurrence" for subsequent abuse); *Diocese of Winona v. Interstate Fire & Cas. Co.*, 89 F.3d 1386, 1395-96 (8th Cir. 1996) (Diocese's knowledge of priest's prior abuse means negligent supervision claim did not allege an "occurrence"); *Cincinnati Ins. Co. v. Oblates of St. Francis de Sales, Inc.*, 2010 WL 3610451 (Ohio App. 2010) (same). The facts are that the Marianists had actual knowledge of Brother Mueller's abusive propensities, contrary to the unsupported denials by Brother Glodek and Fr. Solma. In this regard, the Marianists admit:

- They were told in 1957 that Brother Mueller was leaving notes for a young student telling him that he was attractive and that Brother Mueller wanted to meet up with him. [Material Facts ¶¶ 30-34.]
- A student reported to them in 1966 that Brother Mueller had drugged him with some substance under the guise of a legitimate experiment, rendering him unconscious. The school principal (a Marianist) told the student he would "look in to it." Before the end of the school year, Brother Mueller mysteriously left the school. [Material Facts ¶¶ 47-50.]
- Brother Mueller reappeared at Roncalli High School the next year. In 1967, a Roncalli student reported to a school guidance counselor that he had been knocked out with ether by Brother Mueller under the guise of a legitimate experiment. [Material Facts ¶¶ 53-59.]

The Marianists admit that ethering students was grounds for removing Brother Mueller from his teaching position. [Material Facts at ¶¶ 76-78.] The Material Facts show the Marianists knew by 1967 that Brother Mueller was ethering students. [Material Facts ¶¶ 47-50 and 53-59.] Any subsequent ethering was therefore not an "occurrence." *Hauser*, 221 P.3d at 61; *Diocese of Winona*, 89 F.3d at 1395-96. Similarly, the Marianists do not dispute that ethering students was an integral part of Brother Mueller's pattern of abusive behavior that led to sexual abuse.

[*Compare*, Opening Brief at pgs. 24-26 *with* Response Brief.]   Because the ethering cannot be separated from the sexual abuse, the inseparability doctrine holds that the accompanying sexual abuse (whether or not known) is also not the result of an "occurrence."   *See, e.g., Bohrer v. Church Mut. Ins. Co.*, 965 P.2d 1258, 1264-65 (Colo. 1998); *Cole v. State Farm Fire & Cas. Co.*, 2002 WL 21784 (10th Cir. 2002).

The Marianists do not question the applicability of the inseparability doctrine, arguing instead that they did not have the requisite knowledge of ethering because the Provincial Council did not have notice of Brother Mueller's abuse, citing *Bock v. American Growth Fund Sponsors, Inc.*, 904 P.2d 1381 (Colo. App. 1995). [Response Brief at 23-24.]   This argument is unavailing. There is no requirement in the law that notice be given only to a control group as limited as the Provincial Counsel.   As the *Bock* court itself noted, "notice coming to an officer or agent of a corporation within the scope of his duties is notice to the corporation." *Bock*, 904 P.2d at 1384. *See also*, Restatement (Third) of Agency, §5.02 (notification to an agent with actual or apparent authority is effective as notice to the principal); *FMC Corporation v. Plaisted and Companies*, 72 Cal. Rptr.2d 467, 517 (Cal. App. 1998) (knowledge of "rank-and-file" employees sufficient to establish knowledge necessary for expected or intended exclusion).   The undisputed Material Facts establish that notice of Brother Mueller's abusive conduct and abusive propensities was given to: (1) the Marianists in charge of Maryhurst; (2) the Marianist principal in charge of St. John Vianney; and (3) a Marianists agent at Roncalli High School (the guidance counselor) who the Marianists expected to receive such notice.   [Material Facts ¶¶ 30-34, 43-47 and 53-59.] There is no basis for the Marianists to argue they did not have adequate notice.

In sum, the Marianists knew Brother Mueller was a danger to his students before purchasing insurance from ACE.   Brother Mueller's continued pattern of misconduct during ACE's Policies was therefore not an "occurrence."

**D.**   **If there was an "occurrence," it was a single occurrence per policy year.**

Another fatal flaw in the Marianists' claim against ACE is that even if there was an "occurrence," ACE already paid its applicable limits (and more).   As discussed in the Opening Brief, the "occurrence," if there was one, was the Marianists' negligent supervision of Brother Mueller.   There is but one "occurrence" per policy period because: "All injury or damages arising out of substantially the same general conditions shall be considered as arising out of one occurrence."   [Material Fact ¶ 10.][9]   All of the underlying plaintiffs' injuries arose out of the "same general conditions" – the negligent supervision of Brother Mueller – and therefore constitute one "occurrence."

Nevertheless, the Marianists try to avoid the finding of a single "occurrence" by characterizing the "occurrence" as the "injury-in-fact sustained by each of the settling plaintiff as a result of the misconduct of Brother Mueller due to the allegation of negligent retention, supervision and training by the Marianists."   [Response Brief at pg. 22.]   The Marianists' proposed categorization of the "occurrence," however, does not comport with the definition an "occurrence" and does not make sense in the context of the Insurance Agreement. Characterizing the "occurrence" as the injury-in-fact does not comport with the definition of an "occurrence" because "injury-in-fact" is not itself an "accident" or a "continuous or repeated exposure to conditions" (using the Marianists' proposed definition); it is a result.   Similarly, inserting the Marianists' characterization of an "occurrence" into the Insuring Agreement renders it nonsensical:

> The Company agrees with the named insured to pay on behalf of the Insured all sums that the Insured shall become legally obligated to pay as damages because of personal injury, including death at any time resulting therefrom, sustained by any person … caused by [*the injury-in-fact sustained by each of the settling plaintiff as a result of the misconduct of*

---

[9] This "deemer" language exists even under the definition advocated by the Marianists.   [Second Supplemental Response at pg. 3 of attachment.]

> *Brother Mueller due to the allegation of negligent retention, supervision and training by the Marianists*].

In other words, the Marianists propose to have the Insuring Agreement state that ACE agreed to pay for "injury caused by injury." This makes no sense. An injury does not cause injury. Rather, an injury is the consequence of some action (or inaction). If, on the other hand, the Marianists' negligent supervision of Brother Mueller is the "occurrence," the policy language is harmonized, with ACE agreeing to pay for "injury caused by negligent supervision." This is the correct characterization of the "occurrence." *Fire Ins. Exchange v. Sullivan*, 224 P.3d 348, 351 (Colo. App. 2009) (courts should read the provisions of an insurance policy as a whole, rather than in isolation, and construe the policy so that all provisions are harmonious and none are rendered meaningless); *Cary v. United of Omaha Life Ins. Co.*, 108 P.3d 288, 290 (Colo. 2005) (provision ambiguous only if it is subject to more than one *reasonable* interpretation considering the policy as a whole).

The Marianists next argue that "there is no basis in the law for arguing that each one of the 23 settling plaintiffs should be treated equally." ACE disagrees. Courts are frequently called upon to allocate settlement proceeds among claims and claimants in a variety of contexts. *See, e.g.*, *Colorado Compensation Ins. Authority v. Satterfield*, 131 P.3d 1074, 1077 (Colo. App. 2009) (allocating settlement proceeds between subrogated and non-subrogated claims); *Dye v. U.S.*, 121 F.3d 1399 (allocating settlement proceeds between different types of income for tax purposes). ACE proposed an equitable allocation that assumed each underlying plaintiff would be paid at least $100,000, since that is the per person limit of ACE's Policies and maximizes potential coverage. The Marianists did not offer any alternative allocation scheme.[10]

---

[10] Although the Marianists propose allocating exposure to "$200,000 under the first year of the first policy, $1,000,000 under the second year of the first policy, $1,000,000 under the third year of the first policy, and $600,000 under the first year of the second policy" [Response Brief at pg. 22], there is no explanation of how this allocation was determined. In fact, ACE is unaware of any way to allocate exposure in this manner given the dates that various underlying plaintiffs were abused. This allocation also ignores the limits of insurance.

The manner of allocation, however, does not really matter because regardless of how the settlement is allocated, the timing of the underlying plaintiffs' injuries triggers ACE's per occurrence policy limits and caps ACE's exposure at $1,000,000, as demonstrated in the chart on page 27 of the Opening Brief.

**E.      The Marianists have only arguments of alleged bad faith, not evidence.**

**1.      Choice of law principals favor Missouri law.**

Before addressing the bad faith claims, the Court must determine whether it will apply Missouri or Colorado law. The Marianists do not even attempt to follow the most significant relationship test, instead stating that they have witnesses who will describe certain conduct that took place in Colorado. [Response Brief at pg. 18.] The Marianists, however, do not deny that its alleged injury (its payment of defense costs and contribution toward settlement) occurred in Missouri, not Colorado. The Marianists do not dispute that ACE's allegedly tortious decisions were made in places other than Colorado. The Marianists do not dispute that the Marianists are based in Missouri and that the relationship of the parties in centered in Missouri where the Policies were issued. The heightened burden of proof required by Missouri law, not Colorado law, applies to the bad faith claims.

**2.      The Marianists have no facts to support its bad faith claims.**

The bulk of the Marianists Response Brief is focused on the Marianists' conclusory belief that ACE did not act in accordance with its contractual, common law and statutory obligations. Noticeably absent, however, are any facts supporting this belief. For example, the Marianists are critical that ACE did not step to the forefront of settlement negotiations earlier, thereby permitting settlement opportunities to expire. [Response Brief at pgs. 12, 14 and 17.] However, the Marianists do not identify a single settlement opportunity, within ACE's policy limits, that ACE supposedly missed. Similarly, the Marianists have no evidence that a more favorable settlement could have been achieved if ACE had acted earlier. Indeed, the Marianists' expert,

Richard Hodges, testified it would be speculation for him to opine that the underlying cases would have ended any differently if ACE had taken over negotiations earlier. [Second Clemenson Affidavit at Ex. 14, pg. 158:10-18.]

The Marianists are also critical that they had to contribute to the settlement, yet offer no evidence showing that ACE was obligated to fund the entire settlement. Such an obligation would arise only if, at the time of the settlement, the facts known to ACE showed that the underlying claims were covered (and within limits). As the undisputed Material Facts demonstrate, this was not the case. For example: (1) ACE was concerned about the Situation at Maryhurst letter, yet the Marianists would not explain the letter; (2) ACE was aware of a police report alleging knowledge of sexual abuse in 1965-65, yet the Marianists would not explain the police report; (3) ACE was aware of testimony from one of the underlying plaintiffs that he disclosed abuse in 1966, which the Marianists did not deny; and (4) ACE was aware of three different documents demonstrating reports of abuse from 1971 to 1974. [Material Facts ¶¶ 22-29, 37-42, 55 and 60-71.] In other words, that coverage existed was far from clear. As the Marianists' experts and this Court have acknowledged, an insurer may ask an insured to contribute to a settlement where there are legitimate coverage issues. [Material Fact ¶ 21 and *Order Adopting and Affirming Magistrate Judge's Order* (Docket #162) at pg. 6.] Because there were legitimate coverage questions at the time of settlement, ACE was not required to fund the entire settlement and was permitted to seek contribution without being in bad faith.

### 3. C.R.S. § 10-3-1116 does not apply.

C.R.S. § 10-3-1116 does not apply because Missouri law, not Colorado law, applies to the Marianists' bad faith claims. But even if Colorado law applied, the first-party statutory bad faith statute codified at C.R.S. § 10-3-1116 does not apply to this case.

Initially, it is importation to distinguish first-party insurance policies from third-party insurance policies. The Colorado Supreme Court has explained that first-party policies are

23

policies such as life, health, disability, property, fire or no-fault auto insurance whereas third-party policies are liability policies, such as those at issue in this case. *Goodson v. American Standard Ins. Co. of Wisconsin*, 89 P.3d 409, 414 (Colo. 2004). The Colorado Supreme Court has further explained that:

> When the benefit derives from the insurer's duty to defend the insured against third-party actions, that relationship is characterized as a "third-party claim." A "first-party claim," on the other hand, results when the insured makes a claim against his insurer for benefits accruing directly from the insurance contract.

*Farmers Group, Inc. v. Williams*, 805 P.2d 419, 421 (Colo. 1991).

ACE's Policies are liability insurance policies, not first party policies. Nevertheless, using a strained interpretation of "first-party claimant" in C.R.S. § 10-3-1115(1)(b)(I), the Marianists' argue that C.R.S. § 10-3-1116 applies to this lawsuit. [Response Brief at pgs. 14-17.] However, the statutory definition of "first party claim" is essentially the same as the *Williams* court's definition – both involve benefits owed directly to the insured under the insurance contract. The statutory phrase "on behalf of" does not change the analysis because first party insurers, such as life and health insurers, frequently pay first party benefits to persons other than the insured (*e.g.*, paying a health care provider directly or paying benefits to a life insurance beneficiary). The Colorado Legislature cannot be presumed to have intended to define a term of art ("first party claimant") in exactly the opposite way that the term is commonly understood in the industry affected by the statute and in derogation of years of jurisprudence. Rather, the Legislature intended the statute to apply to what are commonly understood as first party claims. Because there are no first party claims at issue here, the Marianists' statutory bad faith claim must be dismissed.

### 4.    **Payment of Defense Costs.**

The Marianists also criticize the timing of ACE's reimbursement of defense costs. If there is no "occurrence," then ACE did not owe a defense and this issue is rendered moot.

5.      **"Public Impact" Prong of CCPA Claim.**

The Marianists were unable to respond to ACE's arguments to dismiss the CCPA claim because ACE is still in the process of responding to discovery ordered by the Court on December 23, 2010. However, any pages supposedly reserved for this argument were used by the Marianists in its Second Supplemental Response. Still, ACE does not object to the Marianists responding to this discrete issue after the discovery is fully responded to so long as ACE is given an equal opportunity to reply.

DATED: February 14, 2011.

Respectfully submitted,
COZEN O'CONNOR

By: s/ Christopher S. Clemenson
    Christopher S. Clemenson
    707 – 17th Street, Suite 3100
    Denver, CO 80202
    Telephone: (720) 479-3900
    E-mail: cclemenson@cozen.com
    *Attorneys for Century Indemnity Company*

## CERTIFICATE OF SERVICE

I hereby certify that on February 14, 2011, I electronically filed the foregoing with the Clerk of Court using CM/ECF system which will send notification of such filing to the below-referenced person.

William J. Brady
Grimshaw & Harring
1700 Lincoln Street, Suite 3800
Denver CO 80203-4538
wmjbrady@grimshawharring.com

s/ Christopher S. Clemenson
Christopher S. Clemenson
Cozen O'Connor
707 17th St., Suite 3100
Denver, CO 80202
Phone: (720)479-3900
cclemenson@cozen.com
*Attorneys for Century Indemnity Company*